# MASTROBUONO ET AL. *v.* SHEARSON LEHMAN HUTTON, INC., ET AL.

No. 94–18.   Argued January 10, 1995—Decided March 6, 1995

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, *post*, p. 64.

*William J. Harte* argued the cause for petitioners. With him on the briefs were *Robert L. Tucker* and *Joan M. Mannix.*

*Malcolm L. Stewart* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General Days, Deputy Solicitor General Wallace, Simon M. Lorne, Paul Gonson, Jacob H. Stillman, Lucinda O. McConathy,* and *Mark Pennington.*

*Joseph Polizzotto* argued the cause for respondents. With him on the brief were *Phil C. Neal, H. Nicholas Berberian,* and *Robert J. Mandel.**

JUSTICE STEVENS delivered the opinion of the Court.

New York law allows courts, but not arbitrators, to award punitive damages. In a dispute arising out of a standard-form contract that expressly provides that it "shall be governed by the laws of the State of New York," a panel of arbitrators awarded punitive damages. The District Court and Court of Appeals disallowed that award. The question presented is whether the arbitrators' award is consistent with the central purpose of the Federal Arbitration Act to

---

*Briefs of *amici curiae* urging reversal were filed for the American Association of Limited Partners by *Michael B. Dashjian;* for the Public Investors Arbitration Bar Association by *Stuart C. Goldberg* and *Seth E. Lipner.*

*Andrew L. Frey, Andrew J. Pincus,* and *Stuart J. Kaswell* filed a brief for the Securities Industry Association as *amicus curiae* urging affirmance.

ensure "that private agreements to arbitrate are enforced according to their terms." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468, 479 (1989).

I

In 1985, petitioners, Antonio Mastrobuono, then an assistant professor of medieval literature, and his wife Diana Mastrobuono, an artist, opened a securities trading account with respondent Shearson Lehman Hutton, Inc. (Shearson), by executing Shearson's standard-form Client's Agreement. Respondent Nick DiMinico, a vice president of Shearson, managed the Mastrobuonos' account until they closed it in 1987. In 1989, petitioners filed this action in the United States District Court for the Northern District of Illinois, alleging that respondents had mishandled their account and claiming damages on a variety of state and federal law theories.

Paragraph 13 of the parties' agreement contains an arbitration provision and a choice-of-law provision. Relying on the arbitration provision and on §§3 and 4 of the Federal Arbitration Act (FAA), 9 U. S. C. §§3, 4, respondents filed a motion to stay the court proceedings and to compel arbitration pursuant to the rules of the National Association of Securities Dealers. The District Court granted that motion, and a panel of three arbitrators was convened. After conducting hearings in Illinois, the panel ruled in favor of petitioners.

In the arbitration proceedings, respondents argued that the arbitrators had no authority to award punitive damages. Nevertheless, the panel's award included punitive damages of $400,000, in addition to compensatory damages of $159,327. Respondents paid the compensatory portion of the award but filed a motion in the District Court to vacate the award of punitive damages. The District Court granted the motion, 812 F. Supp. 845 (ND Ill. 1993), and the Court of Appeals for the Seventh Circuit affirmed, 20 F. 3d 713 (1994). Both courts relied on the choice-of-law provision in paragraph 13

of the parties' agreement, which specifies that the contract shall be governed by New York law. Because the New York Court of Appeals has decided that in New York the power to award punitive damages is limited to judicial tribunals and may not be exercised by arbitrators, *Garrity* v. *Lyle Stuart, Inc.*, 40 N. Y. 2d 354, 353 N. E. 2d 793 (1976), the District Court and the Seventh Circuit held that the panel of arbitrators had no power to award punitive damages in this case.

We granted certiorari, 513 U. S. 921 (1994), because the Courts of Appeals have expressed differing views on whether a contractual choice-of-law provision may preclude an arbitral award of punitive damages that otherwise would be proper. Compare *Barbier* v. *Shearson Lehman Hutton Inc.*, 948 F. 2d 117 (CA2 1991), and *Pierson* v. *Dean, Witter, Reynolds, Inc.*, 742 F. 2d 334 (CA7 1984), with *Bonar* v. *Dean Witter Reynolds, Inc.*, 835 F. 2d 1378, 1386–1388 (CA11 1988), *Raytheon Co.* v. *Automated Business Systems, Inc.*, 882 F. 2d 6 (CA1 1989), and *Lee* v. *Chica*, 983 F. 2d 883 (CA8 1993). We now reverse.[1]

## II

Earlier this Term, we upheld the enforceability of a predispute arbitration agreement governed by Alabama law, even though an Alabama statute provides that arbitration agreements are unenforceable. *Allied-Bruce Terminix Cos.* v. *Dobson*, 513 U. S. 265 (1995). Writing for the Court, JUSTICE BREYER observed that Congress passed the FAA "to overcome courts' refusals to enforce agreements to arbitrate." *Id.*, at 270. See also *Volt Information Sciences, Inc.* v. *Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S., at 474; *Dean Witter Reynolds Inc.* v. *Byrd*, 470

---

[1] Because our disposition would be the same under either a *de novo* or a deferential standard, we need not decide in this case the proper standard of a court's review of an arbitrator's decision as to the arbitrability of a dispute or as to the scope of an arbitration. We recently granted certiorari in a case that involves some of these issues. *First Options of Chicago, Inc.* v. *Kaplan*, No. 94–560, now pending before the Court.

U. S. 213, 220 (1985). After determining that the FAA applied to the parties' arbitration agreement, we readily concluded that the federal statute pre-empted Alabama's statutory prohibition. *Allied-Bruce,* 513 U. S., at 272–273, 281–282.

Petitioners seek a similar disposition of the case before us today. Here, the Seventh Circuit interpreted the contract to incorporate New York law, including the *Garrity* rule that arbitrators may not award punitive damages. Petitioners ask us to hold that the FAA pre-empts New York's prohibition against arbitral awards of punitive damages because this state law is a vestige of the " " "ancient" ' " judicial hostility to arbitration. See *Allied-Bruce,* 513 U. S., at 270, quoting *Bernhardt* v. *Polygraphic Co. of America, Inc.,* 350 U. S. 198, 211, n. 5 (1956) (Frankfurter, J., concurring). Petitioners rely on *Southland Corp.* v. *Keating,* 465 U. S. 1 (1984), and *Perry* v. *Thomas,* 482 U. S. 483 (1987), in which we held that the FAA pre-empted two California statutes that purported to require judicial resolution of certain disputes. In *Southland,* we explained that the FAA not only "declared a national policy favoring arbitration," but actually "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." 465 U. S., at 10.

Respondents answer that the choice-of-law provision in their contract evidences the parties' express agreement that punitive damages should not be awarded in the arbitration of any dispute arising under their contract. Thus, they claim, this case is distinguishable from *Southland* and *Perry,* in which the parties presumably desired unlimited arbitration but state law stood in their way. Regardless of whether the FAA pre-empts the *Garrity* decision in contracts not expressly incorporating New York law, respondents argue that the parties may themselves agree to be bound by *Garrity,* just as they may agree to forgo arbitration altogether. In other words, if the contract says "no punitive damages," that

is the end of the matter, for courts are bound to interpret contracts in accordance with the expressed intentions of the parties—even if the effect of those intentions is to limit arbitration.

We have previously held that the FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties. In *Volt Information Sciences, Inc.* v. *Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468 (1989), the California Court of Appeal had construed a contractual provision to mean that the parties intended the California rules of arbitration, rather than the FAA's rules, to govern the resolution of their dispute. *Id.*, at 472. Noting that the California rules were "manifestly designed to encourage resort to the arbitral process," *id.*, at 476, and that they "generally foster[ed] the federal policy favoring arbitration," *id.*, at 476, n. 5, we concluded that such an interpretation was entirely consistent with the federal policy "to ensure the enforceability, according to their terms, of private agreements to arbitrate," *id.*, at 476. After referring to the holdings in *Southland* and *Perry*, which struck down state laws limiting agreed-upon arbitrability, we added:

> "But it does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself. Indeed, such a result would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, see *Mitsubishi* [*Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 628 (1985)], so too may they specify by contract the rules under which that arbitration will be conducted." *Volt*, 489 U. S., at 479.

Relying on our reasoning in *Volt*, respondents thus argue that the parties to a contract may lawfully agree to limit the issues to be arbitrated by waiving any claim for punitive damages. On the other hand, we think our decisions in *Allied-Bruce, Southland,* and *Perry* make clear that if contracting parties agree to *include* claims for punitive damages within the issues to be arbitrated, the FAA ensures that their agreement will be enforced according to its terms even if a rule of state law would otherwise exclude such claims from arbitration. Thus, the case before us comes down to what the contract has to say about the arbitrability of petitioners' claim for punitive damages.

## III

Shearson's standard-form "Client Agreement," which petitioners executed, contains 18 paragraphs. The two relevant provisions of the agreement are found in paragraph 13.[2] The first sentence of that paragraph provides, in part, that the entire agreement "shall be governed by the laws of the

---

[2] "Paragraph 13 of the Client's Agreement provides:

"This agreement shall inure to the benefit of your [Shearson's] successors and assigns[,] shall be binding on the undersigned, my [petitioners'] heirs, executors, administrators and assigns, and shall be governed by the laws of the State of New York. Unless unenforceable due to federal or state law, any controversy arising out of or relating to [my] accounts, to transactions with you, your officers, directors, agents and/or employees for me or to this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules then in effect, of the National Association of Securities Dealers, Inc. or the Boards of Directors of the New York Stock Exchange, Inc. and/or the American Stock Exchange Inc. as I may elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you may make such election. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. This agreement to arbitrate does not apply to future disputes arising under certain of the federal securities laws to the extent it has been determined as a matter of law that I cannot be compelled to arbitrate such claims." App. to Pet. for Cert. 44.

State of New York." App. to Pet. for Cert. 44. The second sentence provides that "any controversy" arising out of the transactions between the parties "shall be settled by arbitration" in accordance with the rules of the National Association of Securities Dealers (NASD), or the Boards of Directors of the New York Stock Exchange and/or the American Stock Exchange. *Ibid.* The agreement contains no express reference to claims for punitive damages. To ascertain whether paragraph 13 expresses an intent to include or exclude such claims, we first address the impact of each of the two relevant provisions, considered separately. We then move on to the more important inquiry: the meaning of the two provisions taken together. See Restatement (Second) of Contracts § 202(2) (1979) ("A writing is interpreted as a whole").

The choice-of-law provision, when viewed in isolation, may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship. Thus, if a similar contract, without a choice-of-law provision, had been signed in New York and was to be performed in New York, presumably "the laws of the State of New York" would apply, even though the contract did not expressly so state. In such event, there would be nothing in the contract that could possibly constitute evidence of an intent to exclude punitive damages claims. Accordingly, punitive damages would be allowed because, in the absence of contractual intent to the contrary, the FAA would pre-empt the *Garrity* rule. See *supra*, at 58, and n. 8, *infra*.

Even if the reference to "the laws of the State of New York" is more than a substitute for ordinary conflict-of-laws analysis and, as respondents urge, includes the caveat, "detached from otherwise-applicable federal law," the provision might not preclude the award of punitive damages because New York allows its courts, though not its arbitrators, to enter such awards. See *Garrity,* 40 N. Y. 2d, at 358, 353

N. E. 2d, at 796. In other words, the provision might include only New York's substantive rights and obligations, and not the State's allocation of power between alternative tribunals.[3] Respondents' argument is persuasive only if "New York law" means "New York decisional law, including that State's allocation of power between courts and arbitrators, notwithstanding otherwise-applicable federal law." But, as we have demonstrated, the provision need not be read so broadly. It is not, in itself, an unequivocal exclusion of punitive damages claims.[4]

The arbitration provision (the second sentence of paragraph 13) does not improve respondents' argument. On the contrary, when read separately this clause strongly implies that an arbitral award of punitive damages is appropriate. It explicitly authorizes arbitration in accordance with NASD rules;[5] the panel of arbitrators in fact proceeded under that

---

[3] In a related point, respondents argue that there is no meaningful distinction between "substance" and "remedy," that is, between an entitlement to prevail on the law and an entitlement to a specific form of damages. See Brief for Respondents 25–27. We do not rely on such a distinction here, nor do we pass upon its persuasiveness.

[4] The dissent makes much of the similarity between this choice-of-law clause and the one in *Volt Information Sciences, Inc.* v. *Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468 (1989), which we took to incorporate a California statute allowing a court to stay arbitration pending resolution of related litigation. In *Volt*, however, we did not interpret the contract *de novo*. Instead, we deferred to the California court's construction of its own State's law. *Id.*, at 474 ("[T]he interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review"). In the present case, by contrast, we review a *federal* court's interpretation of this contract, and our interpretation accords with that of the only decisionmaker arguably entitled to deference—the arbitrator. See n. 1, *supra*.

[5] The contract also authorizes (at petitioners' election) that the arbitration be governed by the rules of the New York Stock Exchange or the American Stock Exchange, instead of those of the NASD. App. to Pet. for Cert. 44. Neither set of alternative rules purports to limit an arbitrator's discretion to award punitive damages. Moreover, even if there were any doubt as to the ability of an arbitrator to award punitive damages under

set of rules.[6] The NASD's Code of Arbitration Procedure indicates that arbitrators may award "damages and other relief." NASD Code of Arbitration Procedure ¶ 3741(e) (1993). While not a clear authorization of punitive damages, this provision appears broad enough at least to contemplate such a remedy. Moreover, as the Seventh Circuit noted, a manual provided to NASD arbitrators contains this provision:

"B. Punitive Damages

"The issue of punitive damages may arise with great frequency in arbitrations. Parties to arbitration are informed that arbitrators can consider punitive damages as a remedy." 20 F. 3d, at 717.

Thus, the text of the arbitration clause itself surely does not support—indeed, it contradicts—the conclusion that the parties agreed to foreclose claims for punitive damages.[7]

---

the Exchanges' rules, the contract expressly allows petitioners, the claimants in this case, to choose NASD rules; and the panel of arbitrators in this case in fact proceeded under NASD rules.

[6] As the Solicitor General reminds us, one NASD rule is *not* before us, namely Rule 21(f)(4) of the NASD Rules of Fair Practice, which reads:

"'No agreement [between a member and a customer] shall include any condition which . . . limits the ability of a party to file any claim in arbitration or limits the ability of the arbitrators to make any award.'" Brief for United States et al. 6.

Rule 21(f)(4) applies only to contracts executed after September 7, 1989. Notwithstanding any effect it may have on agreements signed after that date, this rule is not applicable to the agreement in this case, which was executed in 1985.

[7] "Were we to confine our analysis to the plain language of the arbitration clause, we would have little trouble concluding that a contract clause which bound the parties to 'settle' 'all disputes' through arbitration conducted according to rules which allow any form of 'just and equitable' 'remedy of relief' was sufficiently broad to encompass the award of punitive damages. Inasmuch as agreements to arbitrate are 'generously construed,' *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,* [*Inc.,* 473 U. S. 614, 626 (1985)], it would seem sensible to interpret the 'all disputes' and 'any remedy or relief' phrases to indicate, at a minimum, an intention to resolve through arbitration any dispute that would otherwise be settled

Although neither the choice-of-law clause nor the arbitration clause, separately considered, expresses an intent to preclude an award of punitive damages, respondents argue that a fair reading of the entire paragraph 13 leads to that conclusion. On this theory, even if "New York law" is ambiguous, and even if "arbitration in accordance with NASD rules" indicates that punitive damages are permissible, the juxtaposition of the two clauses suggests that the contract incorporates "New York law relating to arbitration." We disagree. At most, the choice-of-law clause introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards. As we pointed out in *Volt,* when a court interprets such provisions in an agreement covered by the FAA, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." 489 U. S., at 476. See also *Moses H. Cone Memorial Hospital* v. *Mercury Constr. Corp.,* 460 U. S. 1, 24–25 (1983).[8]

Moreover, respondents cannot overcome the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it. See, *e. g., United States Fire Ins. Co.* v. *Schnackenberg,* 88 Ill. 2d 1, 4, 429 N. E. 2d 1203, 1205 (1981); *Graff* v. *Billet,* 64 N. Y. 2d 899, 902, 477 N. E. 2d 212, 213–214

---

in a court, and to allow the chosen dispute resolvers to award the same varieties and forms of damages or relief as a court would be empowered to award. Since courts are empowered to award punitive damages with respect to certain types of claims, the Raytheon-Automated arbitrators would be equally empowered." *Raytheon Co.* v. *Automated Business Systems, Inc.,* 882 F. 2d 6, 10 (CA1 1989).

[8] "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone,* 460 U. S., at 24–25.

(1984);[9] Restatement (Second) of Contracts § 206; *United States* v. *Seckinger,* 397 U. S. 203, 210 (1970). Respondents drafted an ambiguous document, and they cannot now claim the benefit of the doubt. The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result.[10] That rationale is well suited to the facts of this case. As a practical matter, it seems unlikely that petitioners were actually aware of New York's bifurcated approach to punitive damages, or that they had any idea that by signing a standard-form agreement to arbitrate disputes they might be giving up an important substantive right. In the face of such doubt, we are unwilling to impute this intent to petitioners.

Finally respondents' reading of the two clauses violates another cardinal principle of contract construction: that a document should be read to give effect to all its provisions and to render them consistent with each other. See, *e. g., In re Halas,* 104 Ill: 2d 83, 92, 470 N. E. 2d 960, 964 (1984); *Crimmins Contracting Co.* v. *City of New York,* 74 N. Y. 2d 166, 172–173, 542 N. E. 2d 1097, 1100 (1989); *Trump-Equitable Fifth Avenue Co.* v. *H. R. H. Constr. Corp.,* 106 App. Div. 2d 242, 244, 485 N. Y. S. 2d 65, 67 (1985); Restatement (Second) of Contracts § 203(a) and Comment *b; id.,* § 202(5). We think the best way to harmonize the choice-of-

---

[9] We cite precedent from Illinois, the forum State and place where the contract was executed, and New York, the State designated in the contract's choice-of-law clause. The parties suggest no other State's law as arguably relevant to this controversy.

[10] The drafters of the Second Restatement justified the rule as follows:

"Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party." Restatement (Second) of Contracts § 206, Comment *a* (1979).

law provision with the arbitration provision is to read "the laws of the State of New York" to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators. Thus, the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration; neither sentence intrudes upon the other. In contrast, respondents' reading sets up the two clauses in conflict with one another: one foreclosing punitive damages, the other allowing them. This interpretation is untenable.

We hold that the Court of Appeals misinterpreted the parties' agreement. The arbitral award should have been enforced as within the scope of the contract. The judgment of the Court of Appeals is, therefore, reversed.

·*It is so ordered.*

JUSTICE THOMAS, dissenting.

In *Volt Information Sciences, Inc.* v. *Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468, 478 (1989), we held that the Federal Arbitration Act (FAA) simply requires courts to enforce private contracts to arbitrate as they would normal contracts—according to their terms. This holding led us to enforce a choice-of-law provision that incorporated a state procedural rule concerning arbitration proceedings. Because the choice-of-law provision here cannot reasonably be distinguished from the one in *Volt*, I dissent.[1]

---

[1] The Seventh Circuit adopted a *de novo* standard of review of the arbitrators' decision. Although we have not yet decided what standard of review to apply in cases of this sort, see *First Options of Chicago, Inc.* v. *Kaplan*, cert. granted, 513 U. S. 1040 (1994), petitioners waived the argument that a deferential standard was appropriate. Petitioners did not raise the argument in their petition for certiorari or in their opening brief. While the standard of review may be an antecedent question, see *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439 (1993), given petitioners' waiver of the argument it seems more appropriate to resolve the question in *First Options* than here.

## I

## A

In *Volt*, Stanford University had entered into a construction contract under which .Volt Information Sciences, Inc., was to install certain electrical systems on the Stanford campus. The contract contained an agreement to arbitrate all disputes arising out of the contract. A choice-of-law clause in the contract provided that "[t]he Contract shall be governed by the law of the place where the Project is located," *id.*, at 470 (citation and internal quotation marks omitted), which happened to be California. When a dispute arose regarding compensation, Volt invoked arbitration. Stanford filed an action in state court, however, and moved to stay arbitration pursuant to California Rules of Civil Procedure. Cal. Civ. Proc. Code Ann. § 1281.2(c) (West 1982). Opposing the stay, Volt argued that the relevant state statute authorizing the stay was pre-empted by the FAA, 9 U. S. C. § 1 *et seq.*

We concluded that even if the FAA pre-empted the state statute as applied to other parties, the choice-of-law clause in the contract at issue demonstrated that the parties had agreed to be governed by the statute. Rejecting Volt's position that the FAA imposes a proarbitration policy that precluded enforcement of the statute permitting the California courts to stay the arbitration proceedings, we concluded that the Act "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." 489 U. S., at 478. As a result, we interpreted the choice-of-law clause "to make applicable state rules governing the conduct of arbitration," *id.*, at 476, even if a specific rule itself hampers or delays arbitration. We rejected the argument that the choice-of-law clause was to be construed as incorporating only substantive law, and dismissed the claim that the FAA pre-empted those contract provisions that might hinder arbitration.

We so held in *Volt* because we concluded that the FAA does not force arbitration on parties who enter into contracts involving interstate commerce. Instead, the FAA requires only that "arbitration proceed in the manner provided for in [the parties'] agreement." 9 U. S. C. § 4. Although we will construe ambiguities concerning the scope of arbitrability in favor of arbitration, see *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U. S. 1, 24–25 (1983), we remain mindful that "as with any other contract, the parties' intentions control," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 626 (1985). Thus, if the parties intend that state procedure shall govern, federal courts must enforce that understanding. "There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volt*, 489 U. S., at 476.

## B

In this case, as in *Volt*, the parties agreed to mandatory arbitration of all disputes. As in *Volt*, the contract at issue here includes a choice-of-law clause. Indeed, the language of the two clauses is functionally equivalent: Whereas the choice-of-law clause in *Volt* provided that "[t]he Contract shall be governed by the law of [the State of California]," *id.*, at 470 (citation and internal quotation marks omitted), the one before us today states, in paragraph 13 of the Client's Agreement, App. to Pet. for Cert. 44, that "[t]his agreement . . . shall be governed by the laws of the State of New York." New York law prohibits arbitrators from awarding punitive damages, *Garrity v. Lyle Stuart, Inc.*, 40 N. Y. 2d 354, 353 N. E. 2d 793 (1976), and permits only courts to award such damages. As in *Volt*, petitioners here argue that the New York rule is "antiarbitration," and hence is pre-empted by the FAA. In concluding that the choice-of-law clause is am-

biguous, the majority essentially accepts petitioners' argument. *Volt* itself found precisely the same argument irrelevant, however, and the majority identifies no reason to think that the state law governing the interpretation of the parties' choice-of-law clause supports a different result.

The majority claims that the incorporation of New York law "need not be read so broadly" as to include both substantive and procedural law, and that the choice of New York law "is not, in itself, an unequivocal exclusion of punitive damages claims." *Ante*, at 60. But we rejected these same arguments in *Volt*, and the *Garrity* rule is just the sort of "state rul[e] governing the conduct of arbitration" that *Volt* requires federal courts to enforce. 489 U. S., at 476. "Just as [the parties] may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted." *Id.*, at 479 (citation omitted). To be sure, the majority might be correct that *Garrity* is a rule concerning the State's allocation of power between "alternative tribunals," *ante*, at 60, although *Garrity* appears to describe itself as substantive New York law.[2] Nonetheless, *Volt* makes no distinction between rules that serve only to distribute authority between courts and arbitrators (which the majority finds unenforceable) and other types of rules (which the majority finds enforceable). Indeed, the California rule in *Volt* could be considered to be one that allocates authority between arbitrators and courts, for it permits California courts to stay arbitration pending resolution of related litigation. See *Volt, supra,* at 471.

---

[2] The New York Court of Appeals rested its holding on the principle that punitive damages are exemplary social remedies intended to punish, rather than to compensate. Because the power to punish can rest only in the hands of the State, the court found that private arbitrators could not wield the authority to impose such damages. *Garrity* v. *Lyle Stuart, Inc.*, 40 N. Y. 2d, at 360, 353 N. E. 2d, at 796–797.

## II

The majority relies upon two assertions to defend its departure from *Volt*. First, it contends that "[a]t most, the choice-of-law clause introduces an ambiguity into an arbitration agreement." *Ante*, at 62. We are told that the agreement "would otherwise allow punitive damages awards," *ibid.*, because of paragraph 13's statement that arbitration would be conducted "in accordance with the rules then in effect, of the National Association of Securities Dealers, Inc. [NASD]." App. to Pet. for Cert. 44. It is unclear which NASD "rules" the parties mean, although I am willing to agree with the majority that the phrase refers to the NASD Code of Arbitration Procedure. But the provision of the NASD Code offered by the majority simply does not speak to the availability of punitive damages. It only states:

> "The award shall contain the names of the parties, the name of counsel, if any, a summary of the issues, including the type(s) of any security or product, in controversy, the damages and other relief requested, the damages and other relief awarded, a statement of any other issues resolved, the names of the arbitrators, the dates the claim was filed and the award rendered, the number and dates of hearing sessions, the location of the hearings, and the signatures of the arbitrators concurring in the award." NASD Code of Arbitration Procedure § 41(e) (1985).

It is clear that § 41(e) does not define or limit the powers of the arbitrators; it merely describes the form in which the arbitrators must announce their decision. The other provisions of § 41 confirm this point. See, *e. g.*, § 41(a) ("All awards shall be in writing and signed by a majority of the arbitrators . . ."); § 41(c) ("Director of Arbitration shall endeavor to serve a copy of the award" to the parties); § 41(d) (arbitrators should render an award within 30 days); § 41(f)

(awards shall be "publicly available"). The majority cannot find a provision of the NASD Code that specifically addresses punitive damages, or that speaks more generally to the types of damages arbitrators may or may not allow. Such a rule simply does not exist. The code certainly does not *require* that arbitrators be empowered to award punitive damages; it leaves to the parties to define the arbitrators' remedial powers.

The majority also purports to find a clear expression of the parties' agreement on the availability of punitive damages in "a manual provided to NASD arbitrators." *Ante,* at 61. But paragraph 13 of the Client's Agreement nowhere mentions this manual; it mentions only "the rules then in effect, of the [NASD]." App. to Pet. for Cert. 44. The manual does not fit either part of this description: it is neither "of the [NASD]," nor a set of "rules."

First, the manual apparently is not an official NASD document. The manual was not promulgated or adopted by the NASD. Instead, it apparently was compiled by members of the Securities Industry Conference on Arbitration (SICA) as a supplement to the Uniform Code of Arbitration, which the parties clearly did not adopt in paragraph 13. Petitioners present no evidence that the NASD has a policy of giving this specific manual to its arbitrators. Nor do petitioners assert that this manual was even used in the arbitration that gave rise to this case. More importantly, there is no indication in the text of the Client's Agreement that the parties *intended* this manual to be used by the arbitrators.

Second, the manual does not provide any "rules" in the sense contemplated by paragraph 13; instead, it provides general information and advice to the arbitrator, such as "Hints for the Chair." SICA, Arbitrator's Manual 21 (1992). The manual is nothing more than a sort of "how to" guide for the arbitrator. One bit of advice, for example, states: "Care should be exercised, particularly when questioning a witness, so that the arbitrator does not indicate disbelief.

Grimaces, frowns, or hand signals should all be avoided. A 'poker' face is the goal." *Id.*, at 19.[3]

Even if the parties had intended to adopt the manual, it cannot be read to resolve the issue of punitive damages. When read in context, the portion of the SICA manual upon which the majority relies seems only to explain what punitive damages *are*, not to establish whether arbitrators have the authority to award them:

> "The issue of punitive damages may arise with great frequency in arbitrations. Parties to arbitration are informed that arbitrators can consider punitive damages as a remedy. Generally, in court proceedings, punitive damages consist of compensation in excess of actual damages and are awarded as a form of punishment against the wrongdoer. If punitive damages are awarded, the decision of the arbitrators should clearly specify what portion of the award is intended as punitive damages, and the arbitrators should consider referring to the authority on which they relied." *Id.*, at 26–27.

A glance at neighboring passages, which explain the purpose of "Compensatory/Actual Damages," "Injunctive Relief," "Interest," "Attorneys' Fees," and "Forum Fees," see *id.*, at 26–29, confirms that the SICA manual does not even attempt to provide a standardized set of procedural rules.

Even if one made the stretch of reading the passage on punitive damages to relate to an NASD arbitrator's authority, the SICA manual limits its own applicability in the situa-

---

[3] Other "rules" include: "The Chair should maintain decorum at all times. Shouting, profanity, or gratuitous remarks should be stopped." SICA, Arbitrator's Manual 20. "Some attorneys think that the more often a statement is made, the truer it becomes. The Chair, however, should discourage needless repetition." *Ibid.* "Immediately after the close of the hearing, the arbitrators usually remain in the hearing room either to begin deliberations or set a date for deliberation. Unlike jurors, the panel members are not restricted from discussing the case among themselves." *Id.*, at 25.

tion presented by this case. According to the manual's Code of Ethics for Arbitrators, "[w]hen an arbitrator's authority is derived from an agreement of the parties, the arbitrator should neither exceed that authority nor do less than is required to exercise that authority completely." *Id.*, at 38. Regarding procedural rules, the code states that "[w]here the agreement of the parties sets forth procedures to be followed in conducting the arbitration or refers to rules to be followed, it is the obligation of the arbitrator to comply with such procedures or rules." *Id.*, at 38–39. The manual clearly contemplates that the parties' agreement will define the powers and authorities of the arbitrator. Thus, we are directed back to the rest of paragraph 13 and the intent of the parties, whose only expression on the issue is their decision to incorporate the laws of New York.[4]

My examination of the Client's Agreement, the choice-of-law provision, the NASD Code of Procedure, and the SICA manual demonstrates that the parties made their intent clear, but not in the way divined by the majority. New York law specifically precludes arbitrators from awarding punitive damages, and it should be clear that there is no "conflict," as the majority puts it, between the New York law and the NASD rules. The choice-of-law provision speaks directly to the issue, while the NASD Code is silent. Giving effect to every provision of the contract requires us to honor the parties' intent, as indicated in the text of the agreement, to preclude the award of punitive damages by arbitrators.

### III

Thankfully, the import of the majority's decision is limited and narrow. This case amounts to nothing more than a fed-

---

[4] It is telling that petitioners did not even claim until their reply brief that paragraph 13 expressed an intent to reserve to arbitrators the authority to award punitive damages. Instead, petitioners consistently have argued only that the agreement did not constitute a "waiver" of their "right" to obtain punitive damages.

eral court applying Illinois and New York contract law to an agreement between parties in Illinois. Much like a federal court applying a state rule of decision to a case when sitting in diversity, the majority's interpretation of the contract represents only the understanding of a single federal court regarding the requirements imposed by state law. As such, the majority's opinion has applicability only to this specific contract and to no other. But because the majority reaches an erroneous result on even this narrow question, I respectfully dissent.