Justice SOTOMAYOR, dissenting.
I join Justice GINSBURG's dissent in full and Part II of Justice KAGAN's dissent.[1] This Court went wrong years ago in concluding that a "shift from bilateral arbitration to class-action arbitration" imposes such "fundamental changes," Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp. , 559 U.S. 662, 686, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010), that class-action arbitration "is not arbitration as envisioned by the" Federal Arbitration Act (FAA), AT&T Mobility LLC v. Concepcion , 563 U.S. 333, 351, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011). See, e.g., id. , at 362-365, 131 S.Ct. 1740 (BREYER, J., dissenting). A class action is simply "a procedural device" that allows multiple plaintiffs to aggregate their claims, 1 W. Rubenstein, Newberg on Class Actions § 1:1 (5th ed. 2011), "[f]or convenience ... and to prevent a failure of justice," Supreme Tribe of Ben-Hur v. Cauble , 255 U.S. 356, 363, 41 S.Ct. 338, 65 L.Ed. 673 (1921). Where, as here, an employment agreement provides for arbitration as a forum for all disputes relating to a person's employment and the rules of that forum allow for class actions, an employee who signs an arbitration agreement should not be expected to realize that she is giving up access to that procedural device.
In any event, as Justice KAGAN explains, the employment contract that Frank Varela signed went further. It states that " 'any and all disputes, claims or controversies arising out of or relating to[ ] the employment relationship between the parties[ ] shall be resolved by final and binding arbitration.' " Post , at ---- (quoting App. to Pet. for Cert. 24a). It adds that Varela and Lamps Plus "consent to the resolution by arbitration of all claims that may hereafter arise in connection with [Varela's] employment." Id ., at 24a-25a. And it provides for arbitration " 'in accordance with' " the rules of the arbitral forum, which in turn allow for class arbitration. Post , at ---- (opinion of KAGAN, J.) (citing App. to Pet. for Cert. 25a-26a). That is enough to persuade me that the contract was at least ambiguous as to whether Varela in fact agreed that no class-action procedures would be available in arbitration if he and his co-workers all suffered the same harm "relating to" and "in connection with" their "employment." See id ., at 24a-25a. And the court below was correct to turn to state law to resolve the ambiguity.
The Court today reads the FAA to pre-empt the neutral principle of state contract law on which the court below relied. I cannot agree. I also note that the majority reaches its holding without actually agreeing that the contract is ambiguous. See ante, at ---- ("[W]e defer to the Ninth Circuit's interpretation and application of state law"). The concurrence, meanwhile, *1428 offers reasons to conclude that the contract unambiguously precludes class arbitration, see ante , at ---- - ----, and n. (opinion of THOMAS, J.), which would avoid the need to displace state law at all.[2] This Court normally acts with great solicitude when it comes to the possible pre-emption of state law, see, e.g., Medtronic, Inc. v. Lohr , 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), but the majority today invades California contract law without pausing to address whether its incursion is necessary. Such haste is as ill advised as the new federal common law of arbitration contracts it has begotten.
Justice KAGAN, with whom Justice GINSBURG and Justice BREYER join, and with whom Justice SOTOMAYOR joins as to Part II, dissenting.
The Federal Arbitration Act (FAA or Act) requires courts to enforce arbitration agreements according to their terms. See ante, at ----. But the Act does not federalize basic contract law. Under the FAA, state law governs the interpretation of arbitration agreements, so long as that law treats other types of contracts in the same way. See DIRECTV, Inc. v. Imburgia , 577 U.S. ----, ----, 136 S.Ct. 463, 468-469, 193 L.Ed.2d 365 (2015). That well-established principle ought to resolve this case against Lamps Plus's request for individual arbitration. In my view, the arbitration agreement Lamps Plus wrote is best understood to authorize arbitration on a classwide basis. But even if the Court is right to view the agreement as ambiguous, a plain-vanilla rule of contract interpretation, applied in California as in every other State, requires reading it against the drafter-and so likewise permits a class proceeding here. See Sandquist v. Lebo Auto., Inc. , 1 Cal. 5th 233, 247, 205 Cal.Rptr.3d 359, 376 P.3d 506, 514 (2016). The majority can reach the opposite conclusion only by insisting that the FAA trumps that neutral state rule whenever its application would result in class arbitration. That holding has no basis in the Act-or in any of our decisions relating to it (including the heavily relied-on Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp. , 559 U.S. 662, 686, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010) ). Today's opinion is rooted instead in the majority's belief that class arbitration "undermine[s] the central benefits of arbitration itself."Ante, at ----. But that policy view-of a piece with the majority's ideas about class litigation-cannot justify displacing generally applicable state law about how to interpret ambiguous contracts. I respectfully dissent.
I
From its very beginning, the arbitration agreement between Lamps Plus and Frank Varela announces its comprehensive scope. The first sentence states: "[T]he parties agree that any and all disputes, claims or controversies arising out of or relating to[ ] the employment relationship between the parties[ ] shall be resolved by final and binding arbitration." App. to Pet. for Cert. 24a. The phrase "any and all disputes, claims, or controversies" encompasses both their individual and their class variants-just as any other general category (e.g., any and all chairs) includes all particular types (e.g., desk and reclining). So Varela's class action (which arose out of or related to his employment) was a "dispute, *1429 claim or controversy" that belonged in arbitration.
The next paragraph continues in the same vein, by describing what Varela gave up by signing the agreement. "[A]rbitration," the agreement says, "shall be in lieu of any and all lawsuits or other civil legal proceedings relating to my employment." Ibid. ; see ibid. (similarly waiving the right "to file a lawsuit or other civil action or proceeding"). That is the language of forum selection: Any and all actions (both individual and class) that I could once have brought in court, I am agreeing now to bring in arbitration. The provision carries no hint of consent to surrender altogether-in arbitration as well as court-the ability to bring a class proceeding.
Further on, the remedial and procedural terms of the agreement support reading it to authorize class arbitration. The arbitrator, according to the contract, may "award any remedy allowed by applicable law." Id., at 26a. That sweeping provision easily encompasses classwide relief when the "any and all disputes" that the contract's first sentence places in arbitration call for such remedies.[1] And under the agreement, the arbitration shall be conducted "in accordance with" the rules of either of two designated arbitration providers-both of which furnish rules for arbitrators to conduct class proceedings. Id., at 25a-26a; see, e.g. , American Arbitration Assn., Supplementary Rules for Class Arbitrations (2011).
Even the section Lamps Plus cites in arguing that the agreement bars class arbitration instead points to the opposite conclusion. In describing what the agreement covers, one provision states: "The Company and I mutually consent to the resolution by arbitration of all claims or controversies ('claims'), past, present or future that I may have against the Company." App. to Pet. for Cert. 24a; see id., at 24a-25a ("Specifically, the Company and I mutually consent to the resolution by arbitration of all claims that may hereafter arise in connection with my employment"). Lamps Plus (along with the concurrence, see ante, at ---- - ---- (opinion of THOMAS, J.)) highlights "th[e] repeated use of singular personal pronouns" there, contending that it is incompatible with a form of arbitration that also involves other parties' claims. Brief for Petitioners 17. But the use of the first person singular merely reflects that the agreement is bilateral in nature-between Varela and Lamps Plus. Those pronouns do not resolve whether one of those parties ("I") can bring to arbitration class disputes, as well as individual disputes, relating to his employment. The part of the quoted section addressing that question is instead the phrase "all claims or controversies." And that phrase supplies the same answer as the agreement's other provisions. For it too is broad enough to cover both individual and class actions-the ones Varela brings alone and the ones he shares with co-workers.[2]
*1430 II
Suppose, though, you think that my view of the agreement goes too far. Maybe you aren't sure whether the phrase "any and all disputes, claims or controversies" must be read to include class "disputes, claims or controversies." Or maybe you wonder whether the surrounding "I" and "my" references limit that phrase's scope, rather than merely referring to one of the contract's signatories. In short, you can see reasonable arguments on both sides of the interpretive dispute-for allowing, but also for barring, class arbitration. You are then in the majority's position, "accept[ing]" the arbitration agreement as "ambiguous." Ante, at ----. What should follow?
Under California law (which applies unless preempted) the answer is clear: The agreement must be read to authorize class arbitration. That is because California-like every other State in the country-applies a default rule construing "ambiguities" in contracts "against their drafters." Sandquist , 1 Cal. 5th, at 247, 205 Cal.Rptr.3d 359, 376 P.3d at 514 ; see Cal. Civ. Code Ann. § 1654 (West 2011) ; see also Brief for Contract Law Scholars as Amici Curiae 10-12, and n. 4 (listing decisions from all 50 States applying that rule). This anti-drafter canon-which "applies with peculiar force" to form contracts like Lamps Plus's-promotes clarity in contracting by resolving ambiguities against the party who held the pen. Sandquist , 1 Cal. 5th, at 248, 205 Cal.Rptr.3d 359, 376 P.3d at 514 (quoting Graham v. Scissor-Tail, Inc. , 28 Cal. 3d 807, 819, n. 16, 171 Cal.Rptr. 604, 623 P.2d 165, 172, n. 16 (1981) ); see Ayres & Gertner, Filling Gaps in Incomplete Contracts, 99 Yale L. J. 87, 91, 105, n. 80 (1989). And the rule makes quick work of interpreting the arbitration agreement here. Lamps Plus drafted the agreement. It therefore had the opportunity to insert language expressly barring class arbitration if that was what it wanted. It did not do so. It instead (at best) left an ambiguity about the availability of class arbitration. So California law holds that Lamps Plus cannot now claim the benefit of the doubt as to the agreement's meaning. Even the majority does not dispute that point. See ante, at ----, ----.
And contrary to the rest of the majority's opinion,[3] the FAA contemplates that such a state contract rule will control the interpretation of arbitration agreements. Under the FAA, courts must "enforce arbitration agreements according to their terms." Epic Systems Corp. v. Lewis , 584 U.S. ----, ----, 138 S.Ct. 1612, 1621, 200 L.Ed.2d 889 (2018) (internal quotation marks omitted); see 9 U.S.C. § 4 (requiring that "arbitration proceed in the manner provided for in such agreement"). But the construction of those contractual terms (save for in limited circumstances, addressed below) is "a question of state law, which this Court does not sit to review."
*1431 Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ. , 489 U.S. 468, 474, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). The Court has made that crucial point many times. Nothing in the FAA (as contrasted to today's majority opinion) "purports to alter background principles of state contract law regarding" the scope or content of agreements. Arthur Andersen LLP v. Carlisle , 556 U.S. 624, 630, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009). Or again: When ruling on an arbitration agreement's meaning, courts "should apply ordinary state-law principles." First Options of Chicago, Inc. v. Kaplan , 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Or yet again: The interpretation of such an agreement is "a matter of state law to which we defer." DIRECTV, Inc. , 577 U.S., at ----, 136 S.Ct., at 468. In short, the FAA does not federalize contract law.
Except when state contract law discriminates against arbitration agreements. As this Court has explained, the FAA came about because courts had shown themselves "unduly hostile to arbitration." Epic Systems , 584 U.S., at ----, 138 S.Ct., at 1621. To remedy that problem, Congress built an "equal-treatment principle" into the Act, requiring courts to "place arbitration agreements on an equal footing with other contracts." Kindred Nursing Centers L. P. v. Clark , 581 U.S. ----, ----, 137 S.Ct. 1421, 1424, 197 L.Ed.2d 806 (2017) ; AT&T Mobility LLC v. Concepcion , 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) (internal quotation marks omitted); see 9 U.S.C. § 2 (making arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"). So any state rule treating arbitration agreements worse than other contracts "stand[s] as an obstacle" to achieving the Act's purposes-and is preempted. Concepcion , 563 U.S. at 343, 131 S.Ct. 1740. That means the FAA displaces any state rule discriminating on its face against arbitration. See id., at 341, 131 S.Ct. 1740. And the Act likewise preempts any more subtle law "disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements." Kindred Nursing , 581 U.S., at ----, 137 S.Ct., at 1426. What matters, as this Court reiterated last Term, is whether the state law in question "target[s]" arbitration agreements, blatantly or covertly, for substandard treatment. Epic Systems , 584 U.S., at ----, 138 S.Ct., at 1622.[4] When the law does so, it cannot operate; when, conversely, it treats arbitration agreements the same as all other contracts, the FAA leaves it alone.
Here, California's anti-drafter rule is as even-handed as contract rules come. It does not apply only to arbitration contracts. Nor does it apply (as the rule we rejected in Concepcion did) only a tad more broadly to "dispute-resolution contracts," pertaining to both arbitration and litigation. 563 U.S. at 341, 131 S.Ct. 1740 (holding that a ban on collective-action waivers in those contracts worked to "disfavor[ ] arbitration"). Instead, the anti-drafter *1432 rule, as even the majority admits, applies to every conceivable type of contract-and treats each identically to all others. See Sandquist , 1 Cal. 5th, at 248, 205 Cal.Rptr.3d 359, 376 P.3d at 514 ("This general principle of contract interpretation applies equally to the construction of arbitration provisions"); ante, at ---- - ----. And contrary to what the majority is left to insist, the rule does not "target arbitration" by "interfer[ing] with [one of its] fundamental attributes"-i.e., its supposed individualized nature. Ante, at ---- (internal quotation marks omitted); see ante, at ---- - ----. The anti-drafter rule (again, quite unlike Concepcion 's ban on class-action waivers) takes no side-favors no outcome-as between class and individualized dispute resolution. All the anti-drafter rule asks about is who wrote the contract. So if, for example, Varela had drafted the agreement here, the rule would have prevented, rather than permitted, class arbitration.[5] Small wonder, then, that this Court has itself used the anti-drafter canon to interpret an arbitration agreement. See Mastrobuono v. Shearson Lehman Hutton, Inc. , 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (construing an ambiguous arbitration agreement against the drafter's interest). In that case (as properly in any other), the rule's through-and-through neutrality made preemption unthinkable.[6]
So this case should come out Varela's way even if the agreement is ambiguous. To repeat the simple logic applicable here: Under the FAA, state law controls the interpretation of arbitration agreements unless that law discriminates against arbitration; the anti-drafter default rule is subject to no such objection; the rule therefore compels this Court to hold that the agreement here authorizes class arbitration. That the majority thinks the contract, as so read, seriously disadvantages Lamps Plus, see ante, at ---- - ----, is of no moment (any more than if state law had instead construed the contract to produce adverse consequences for Varela). The FAA was enacted to protect against judicial hostility toward arbitration agreements. See supra, at ----. But the Act provides no warrant for courts to disregard neutral state law in service of ensuring that those agreements give defendants the best terms possible. Or said otherwise: Nothing in the FAA shields a contracting party, operating against the backdrop of impartial state law, from the consequences of its own drafting decisions. How, then, could the majority go so wrong?
Stolt-Nielsen offers the majority no excuse: Far from "control[ling]" this case, ante, at ----, that decision addressed a different situation-and explicitly reserved decision of the question here. In Stolt-Nielsen , the contracting parties entered into a formal stipulation that "they had not reached any agreement on the issue of class arbitration." 559 U.S. at 673, 130 S.Ct. 1758. The case thus involved not the mere absence of express language about class arbitration, but a joint avowal that the parties had never resolved the issue.
*1433 Facing that oddity, an arbitral panel compelled class arbitration based solely on its "own conception of sound policy." Id., at 675, 130 S.Ct. 1758 ; see id., at 676, 130 S.Ct. 1758 ("[T]he panel did [nothing] other than impose its own policy preference"). This Court rejected the panel's decision for that reason, holding that a party need not "submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." Id. , at 684, 130 S.Ct. 1758. But the Court went no further. In particular, it did not resolve cases like this one, where a neutral interpretive rule (even if not an express term) enables an adjudicator to determine a contract's meaning. To the contrary, the Court disclaimed any view on that question. Yes, the Court held, "a contractual basis" was needed for class arbitration. Ibid. (emphasis added). But given the panel's reliance on policy alone, the Court explained that it had "no occasion to decide what contractual basis" was required. Id., at 687, n. 10, 130 S.Ct. 1758 (emphasis added); see Oxford Health Plans LLC v. Sutter , 569 U.S. 564, 571, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013) ("We overturned the arbitral decision [in Stolt-Nielsen ] because it lacked any contractual basis for ordering class procedures," not because it relied on an inadequate one).
Indeed, parts of Stolt-Nielsen -as well as later decisions-indicate that applying the anti-drafter rule to ambiguous language provides a sufficient contractual basis for class arbitration. In Stolt-Nielsen , we faulted the arbitrators for failing to inquire whether the relevant law "contain[ed] a default rule" that would construe an arbitration clause "as allowing class arbitration in the absence of express consent." 559 U.S. at 673, 130 S.Ct. 1758 (internal quotation marks omitted). We thus implied that such a default rule-like the anti-drafter canon here-can operate to authorize class arbitration when an agreement's language is ambiguous. And that is just how Concepcion (the other decision the majority relies on, see ante, at ---- ----, ---- - ----) understood Stolt-Nielsen 's reasoning. Said Concepcion : We held in Stolt-Nielsen "that an arbitration panel exceeded its power [by] imposing class procedures based on policy judgments rather than the arbitration agreement itself or some background principle of contract law that would affect its interpretation." 563 U.S. at 347, 131 S.Ct. 1740 (emphasis added); see Oxford Health, 569 U.S. at 571, 133 S.Ct. 2064 (similarly noting that Stolt-Nielsen criticized the arbitrators for failing to consider whether a "default rule" resolved the class arbitration question (internal quotation marks omitted)). The Court has thus (rightly) viewed the use of default rules as a run-of-the-mill aspect of contract interpretation, which (so long as neutrally applied) can support class arbitration.
And nothing particular to the anti-drafter rule justifies a different conclusion, as the majority elsewhere suggests, see ante, at ---- - ----.[7] That rule, proclaims the *1434 majority, reflects "public policy considerations," rather than "help[ing] to interpret the meaning of a term" as understood by the parties. Ante, at ----. The majority here notes that some commentators have viewed some equitable factors as supporting the rule, see ante, at ---- - -----which is no doubt right. But see 11 R. Lord, Williston on Contracts § 30:1, p. 11 (4th ed. 2012) (Williston) (stating that the rule is not justified by public interest considerations). But if the majority means to claim-as it must to prove its point-that the anti-drafter rule has no concern with what "the part[ies] agreed to," Stolt-Nielsen , 559 U.S. at 684, 130 S.Ct. 1758, then the majority is flat-out wrong. From an ex ante perspective, the rule encourages the drafter to set out its intent in clear contractual language, for the other party then to see and agree to. See Ayres & Gertner, 99 Yale L. J., at 91, 105, n. 80 (stating the modern view); 2 W. Blackstone, Commentaries on the Laws of England 380 (1766) (anticipating that view by 200-plus years). And from an ex post perspective, the rule enables an interpreter to resolve any remaining uncertainty in line with the parties' likely expectations. See 11 Williston § 30:1, at 11. Consider this very contract. Lamps Plus, knowing about the anti-drafter rule, still chose not to include a term prohibiting class arbitration. And Varela, seeing only the language sending "any and all disputes, claims, or controversies" to arbitration, had no reason to think class disputes barred. Cf. ibid. ("[T]he party addressed will understand ambiguous language in the sense most favorable to itself"). The upshot is that the rule (as this Court recognized in another arbitration case) protects against "unintended" consequences. Mastrobuono , 514 U.S. at 63, 115 S.Ct. 1212.
And even if that were not so evident, the FAA does not empower a court to halt the operation of such a garden-variety principle of state law. Nothing in the Act's text requires the displacement of state contract rules, as the majority implicitly concedes. See ante, at ----. Nor do the Act's purposes, so long as the state rule (as is true here) extends to all contracts alike, without disfavoring arbitration. See supra, at ---- - ----. The idea that the FAA blocks a state rule satisfying that standard because (a court finds) the rule has too much "public policy" in it comes only from the majority's collective mind. That approach disrespects the preeminent role of the States in designing and enforcing contract rules. It discards a universally accepted principle of contract interpretation in favor of unsupported assertions about what the parties must have (or could not possibly have) consented to. It subordinates authoritative state law to (at most) the impalpable emanations of federal policy, impossible to see except in just the right light.[8]
*1435 For that reason, it would never have graced the pages of the U.S. Reports save that this case involves ... class proceedings.
The heart of the majority's opinion lies in its cataloging of class arbitration's many sins. See ante, at 1416. In that respect, the opinion comes from the same place as (though goes a step beyond) this Court's prior arbitration decisions. See, e.g., Concepcion , 563 U.S. at 350, 131 S.Ct. 1740 (lamenting that class arbitration "greatly increases risks to defendants" by "aggregat[ing] and decid[ing] at once" the "damages allegedly owed to tens of thousands of potential claimants"); Epic Systems , 584 U.S., at ----, 138 S.Ct., at 1646 (similarly bemoaning the greater costs and complexity of class proceedings). The opinion likewise has more than a little in common with this Court's efforts to pare back class litigation. See, e.g., Comcast Corp. v. Behrend , 569 U.S. 27, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013) ; Wal-Mart Stores, Inc. v. Dukes , 564 U.S. 338, 348-360, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). In this case, the result is to disregard the actual contract the parties signed. And to dismiss the neutral and commonplace default rule that would construe that contract against the drafting party. No matter what either requires, the majority will prohibit class arbitration. Does that approach remind you of anything? It should. Here (again) is Stolt-Nielsen as Concepcion described it: The panel exceeded its authority by "imposing class procedures based on policy judgments rather than the arbitration agreement itself or some background principle of contract law that would affect its interpretation." 563 U.S. at 347, 131 S.Ct. 1740 ; see supra, at 1433. Substitute "foreclosing" for "imposing" and that is what the Court today has done. It should instead-as the FAA contemplates-have left the parties' agreement, as construed by state law, alone.

Two intermediate California courts have held, based on similar language, that an arbitration agreement did not authorize class arbitration. See Nelsen v. Legacy Partners Residential, Inc. , 207 Cal. App. 4th 1115, 1129-1131, 144 Cal.Rptr.3d 198, 210-211 (2012) ; Kinecta Alternative Financial Solutions, Inc. v. Superior Court of Los Angeles Cty. , 205 Cal. App. 4th 506, 517-519, 140 Cal.Rptr.3d 347, 356-357 (2012), disapproved of on other grounds by Sandquist v. Lebo Automotive, Inc. , 1 Cal. 5th 233, 205 Cal.Rptr.3d 359, 376 P.3d 506 (2016).

I am not persuaded at this point that the Court of Appeals lacked jurisdiction over this case, and for that reason I do not join Justice BREYER's dissenting opinion. Nevertheless, I believe that Justice BREYER's opinion raises weighty issues that are worthy of further consideration if raised in the appropriate circumstances in the lower federal courts.

The majority notes that I criticize it for not checking for such an off-ramp while being unable to take one myself. See ante , at ----, n. 3. But the majority never suggests that it shares my rationale as to why the contract is ambiguous. In other words, the reasons that I reach the issue that the majority decides say nothing about whether the majority would get there itself, short of deferring to the lower federal court.

In discussing another arbitration provision, this Court identically reasoned: "[I]t would seem sensible to interpret the 'all disputes' and 'any remedy or relief' phrases to indicate, at a minimum, an intention to resolve through arbitration any dispute that would otherwise be settled in a court, and to allow the chosen dispute resolvers to award the same varieties and forms of damages or relief as a court would be empowered to award." Mastrobuono v. Shearson Lehman Hutton, Inc. , 514 U.S. 52, 61-62, n. 7, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (internal quotation marks omitted). Here, that means sending to arbitration (among other things) class disputes seeking class relief.

An additional semantic point that Lamps Plus makes essentially concedes my reading of the agreement. At oral argument, Lamps Plus acknowledged that the contract would authorize class arbitration if it provided that Varela could bring to the arbitral forum any "lawsuits," rather than any "claims," he had or could have brought against the company. Tr. of Oral Arg. 31-32. The idea is apparently that suits can be classwide while claims must be personal. But even assuming (without accepting) that is so, the agreement never speaks only of "claims." Even when that word appears alone (rather than alongside "disputes" or "controversies"), it in fact functions as a defined term meaning "claims or controversies." See App. to Pet. for Cert. 24a (referring to "all claims or controversies ('claims')"). And if lawsuits are not necessarily personal (as Lamps Plus admits), then neither are controversies. So by Lamps Plus's own reasoning, Varela should be able to bring to arbitration all controversies (including classwide ones) he had or could have brought to court.

I say "the majority's," but although five Justices have joined today's opinion, only four embrace its reasoning. See n. 8, infra .

In its many decades of FAA caselaw, the Court has preempted state law in just one other, "narrow" circumstance: Whatever state law might say, courts must find "clear and unmistakable evidence" before deciding that an agreement authorizes an arbitrator to decide a so-called "question of arbitrability." Green Tree Financial Corp. v. Bazzle , 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) (plurality opinion) (internal quotation marks and alterations omitted); Oxford Health Plans LLC v. Sutter , 569 U.S. 564, 569, n. 2, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013). As the majority acknowledges, that requirement is not at issue here because Varela and Lamps Plus agreed that a judge should decide the availability of class arbitration (even assuming that question is one of arbitrability). See ante , at ----, n. 4.

Similarly, if Lamps Plus, as the agreement's author, had wanted class arbitration (perhaps because that would resolve many related cases at once) and Varela had resisted it (perhaps because he thought his case better than the others), the anti-drafter rule would have prevented, rather than permitted, class arbitration.

Our decision in DIRECTV, Inc. v. Imburgia , 577 U.S. ----, 136 S.Ct. 463, 193 L.Ed.2d 365 (2015), also assumed that a court may generally apply a State's anti-drafter rule to arbitration agreements. It was only because the court there applied that rule to an un ambiguous contract-in contrast to what the court would have done in a non-arbitration case-that we reversed its decision. See id., at ----, ----, 136 S.Ct., at 469.

The majority actually sends conflicting signals about the extent to which its holding extends beyond the anti-drafter rule to other background principles that serve to discern the meaning of ambiguous contract language. Many of the majority's statements indicate that any tool for resolving contractual ambiguity is forbidden if it leads to class arbitration. See, e.g., ante, at ---- (stating flatly that "an ambiguous agreement [cannot] provide the necessary 'contractual basis' for compelling class arbitration"). But the part of the opinion focusing on the anti-drafter rule suggests that today's holding applies to only a subset of contract default rules-to wit, those (supposedly) sounding in "public policy considerations." See ante, at ---- - ----. On that theory of the decision, courts and arbitrators will have to work out over time which interpretive principles fall within that category. The majority's own flawed analysis of the anti-drafter canon, see infra , at ---- - ----, indicates the perils of that undertaking.

Given this extraordinary displacement of state law-which, as I have shown, no precedent commands, see supra, at ---- - -----I must admit to not understanding Justice THOMAS's full concurrence in today's opinion. See ante, at ---- (expressing "skeptic[ism]" about the majority's reasoning but joining its opinion out of a (misplaced) respect for precedent). I would think the opinion a hard pill to swallow for someone who believes that any implied preemption "leads to the illegitimate-and thus, unconstitutional-invalidation of state laws." Wyeth v. Levine , 555 U.S. 555, 604, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (THOMAS, J., concurring in judgment); see, e.g., Bates v. Dow Agrosciences LLC , 544 U.S. 431, 459, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (THOMAS, J., concurring in judgment in part) ("[P]re-emption analysis is not a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" (internal quotation marks and alteration omitted)).