**C.P. APPAREL MANUFACTURING CORP., Plaintiff,**

v.

**MICROFIBRES, INC., and Microfibres Europe N.V., Defendants.**

**No. 97 CIV. 8691 RMB AJP.**

United States District Court, S.D. New York.

May 23, 2000.

Noel H. Kaplan, Alicia A. Weissmeier, Lapatin Lewis Kaplan & Weissmeier, PLLC, New York City, Anthony P. Mennella, Staten Island, NY, for C.P. Apparel Mfg. Corp.

Ira G. Greenberg, Edwards & Angell, New York City, for Microfibres, Inc.

### *DECISION AND ORDER*

BERMAN, District Judge.

C.P. Apparel Manufacturing Corpora-

---

tion ("Plaintiff")[1] filed this action on about November 21, 1997, against Microfibres, Inc. ("Microfibres–U.S.") and Microfibres Europe, N.V. ("Microfibres–Europe")(collectively, the "Defendants")[2] seeking approximately $31 million in damages from Defendants for, among other things, alleged breach of contract. Defendants, in turn, have brought counterclaims against Plaintiff for alleged breach of contract. Plaintiff now moves *in limine* seeking an Order prohibiting Defendants from introducing at trial parol evidence to aid in the interpretation of certain written "agreements"[3] from which Plaintiff's causes of action arose. Oral argument was held on April 21, 2000. **For the reasons set forth below, Plaintiff's motion is granted.**

### Analysis

The New York State Uniform Commercial Code ("UCC") § 2–202 provides that:

1. Plaintiff, a New York corporation, is in the business of promoting and selling printed nylon flocked fabrics for the upholstered furniture industry.

2. Defendant Microfibres–U.S., a Rhode Island corporation, and Defendant Microfibres–Europe, a Belgian corporation, are in the business of manufacturing, printing and selling printed nylon flocked fabrics for the upholstered furniture industry.

3. Plaintiff has attached two contracts to its moving brief as Exhibit A. The first contract is a three page document titled "Agreement for Distribution of Microfibres Products for Indian Market" dated August 30, 1995 ("Distribution Agreement"). The second contract is a one page document titled "Agreement Regarding Short Rolls of Microfibres' Products" dated August 30, 1995 ("Short Rolls Agreement"). These contracts— along with at least one other agreement not at issue here— concern the sale of Defendants' fabrics to Plaintiff for distribution in the Indian market. The parties' briefs focus almost exclusively on the Distribution Agreement; the instant Order, therefore, addresses only the Distribution Agreement.

4. The parties have not directly addressed in their papers the choice of law issue as to the

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

U.C.C. § 2–202.[4] Thus, if the language of a contract is unambiguous, as here, parol interpretation of the Distribution Agreement. Each side has cited to cases under New York law. "It is axiomatic that a federal court sitting in diversity follows the choice of law principles of the state of its situs." *Reeves v. American Broadcasting Companies, Inc.,* 719 F.2d 602, 605 (2d Cir.1983)(citing *Klaxon Co. v. Stentor Elec. Mfg.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). New York applies the "grouping of contacts" or "center of gravity" analysis to choice of law cases involving contracts. *See Zurich Insurance v. Shearson Lehman Hutton,* 84 N.Y.2d 309, 317, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994). As noted, Plaintiff is a New York corporation; Defendant Microfibres–U.S. is a Rhode Island corporation; and Defendant Microfibres–Europe is a Belgian corporation (although it is apparently owned/controlled by Microfibres–U.S.). The Distribution Agreement was negotiated over the telephone between Plaintiff in New York and Defendants' representatives in North Carolina and was executed in North Carolina. In the instant case, both parties have submitted to the jurisdiction of this Court, agreed that the U.C.C. applies, and, as noted, relied upon the law of New York in their briefs. *See* U.C.C. § 1–105 ("when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this

evidence is not admissible. *See Norwest Financial, Inc. v. Fernandez*, 1999 WL 946786 at *1 (S.D.N.Y. Oct.19, 1999). *See also Simpson v. Mutual of Omaha Insurance Co.*, 2000 WL 322780 at *4 (S.D.N.Y. Mar.28, 2000)("[i]f a contract is unambiguous, a court is 'required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning' ") (citations omitted). Ambiguous language is " 'that which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business' while unambiguous language is that which 'has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion.' " *Norwest Financial, Inc.*, 1999 WL 946786 at *2 (citation omitted). Courts have cautioned that " '[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning.' " *Id.* (citation omitted)

The Distribution Agreement, as well as the Short Rolls Agreement, was drafted by Michael Czarnecki, the Vice President of Sales and Marketing for Defendant Micro-

fibres–U.S. On August 30, 1995, both agreements were executed by Plaintiff and Defendants. The Distribution Agreement, which is the focus of the instant motion, provides, in relevant part, as follows:

It is a pleasure to appoint you as an exclusive distributor for Microfibres' products in India for a period of five (5) years. The goods will be sold to you for the Indian market only.

The Agreement is based on the following terms and conditions: . . .

2.  You agree to purchase an average of 20,000 yds/month of first quality fabric and 20,000 yds. of closeouts (overstocks/special fiber) for the next twelve (12) months starting immediately upon the signing of this contract this month. You also agree to purchase a minimum average of 10,000 yds. per month of first quality goods from Microfibres–Europe. You will also receive 15,000 yds./month from Microfibres–Europe on closeout/seconds based on availability.

3.  You will increase your purchases of first quality fabrics by 15% per year to maintain this exclusive agreement. Failure to achieve these performance guarantees can result in termination of this agreement.

(Plaintiff's Moving Br., Exhibit A).[5] Plaintiff contends that these provisions constitute a clear and unambiguous agreement between the parties that "starting immediately" upon the signing of the Distribution Agreement: (i) Plaintiff will purchase a

state or of such other state or nation shall govern their rights and duties"). The Court notes that both North Carolina and Rhode Island, like New York, have adopted the U.C.C., including U.C.C. § 2–202. *See* N.C. Gen.Stat. § 25–2–202; R.I. Gen. Laws § 6A–2–202. Since it appears that application of the laws of New York, North Carolina or Rhode Island would yield (substantially) the same result, the Court need not decide the choice of law issue. *See Alaska Russia Salm-*

*on Caviar Co., Inc. v. M/V "MARIT MAERSK",* 2000 WL 145124 at *2 n. 4 (S.D.N.Y. Feb.2, 2000).

5.  The Court notes that the Distribution Agreement is executed by both parties and contains a number of other important terms including detailed terms regarding prices and payment. (Plaintiff's Moving Brief, Exhibit A).

certain quantity of first quality fabric per month from Defendants (i.e., an average of 20,000 yards per month of first quality fabric from Microfibres–U.S. and an average of 10,000 yards per month of first quality fabric from Microfibres–Europe) and will increase such purchases by 15% per year in order to maintain the exclusive agreement and that Defendants will make this quantity of first quality fabric available for purchase each month; [6] and (ii) Plaintiff will purchase a certain quantity of closeout/seconds per month based on availability (i.e., an average of 20,000 yards per month form Microfibres–U.S. and 15,000 yards per month from Microfibres–Europe).[7]

Defendants have a starkly different interpretation of the provisions, arguing, among other things, that while the first two sentences of paragraph 2 require Plaintiff to purchase a certain quantity of first quality goods from Defendants, it places "no requirement on Microfibres to deliver those goods ..." (Defendants' Opposition Brief at 3). Defendants' go on to argue that "paragraph 2's only requirement for Microfibres is in its third sentence— that Microfibres–Europe deliver 15,000 yards per month from Microfibres–Europe on closeouts/seconds based on availability." (*Id.*).[8] At oral argument, Defense counsel (even) stated that due to "a serious shortage of production capacity," Defendants "could not have delivered [the] quantity of first quality goods" promised in the Distribution Agreement. (Tr. at 32–34). This fact would have rendered the Distribution Agreement meaningless from its inception, despite the fact that the contract terms were to "start[ ] immediately upon signing of this contract ..." (Plaintiff's Moving Br., Exhibit A).

Defendants' interpretation clearly " 'strain[s] the contract language beyond its reasonable and ordinary meaning.' " *Norwest Financial, Inc.*, 1999 WL 946786 at *2. *See also Reape v. New York News, Inc.*, 122 A.D.2d 29, 30, 504 N.Y.S.2d 469 (N.Y.App.Div.1986), *appeal denied*, 68 N.Y.2d 610, 508 N.Y.S.2d 1027, 501 N.E.2d 600 (1986)("where a particular interpretation would lead to an absurd result, the courts can reject such a construction in favor of one which would better accord with the reasonable expectations of the parties"). Defendants' interpretation of paragraph 2 is not reasonable because, among other things, it renders most, if not all, other parts of the Distribution Agreement meaningless. *See Norwest Financial, Inc.*, 1999 WL 946786 at *3; *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Associates*, 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 472 N.E.2d 315 (1984). For example, Defendants' interpretation renders paragraph 3, an otherwise clear and unambiguous supply/purchase requirement, completely meaningless. It is not commercially reasonable to require Plain-

---

**6.** It is undisputed that Plaintiff ordered large quantities of first quality fabrics from Defendants, only a small amount of which was actually delivered. (Joint Consolidated Pre-Trial Order dated April 29, 1999 at ¶¶ 46, 47, 52, 53).

**7.** Closeouts /seconds are not planned production and, thus, hinge upon availability. (Transcript of April 21, 2000 Oral Argument ("Tr.") at 9).

**8.** The parties agree that, though it is not explicitly stated, the second clause of the first sentence of paragraph 2, which pertains to closeouts, is modified by the phrase "based on availability." Because closeouts are not planned production, *a fortiori* they hinge on availability. (Transcript of April 21, 2000 Oral Argument at 9). Such an interpretation is reasonable and appropriate in light of the " 'customs, practices, usages and terminology as generally understood' " in the industry. *See Norwest Financial, Inc.*, 1999 WL 946786 at *2 (citation omitted).

tiff to increase its purchases of first quality fabrics by 15% per year if the Defendants have no obligation to actually deliver the goods ordered by Plaintiff. Defendants' argument simply makes no commercial sense.[9] *See Norwest Financial, Inc.,* 1999 WL 946786 at *3 (quoting *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985))("'an interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect'").

Moreover, Defendants' interpretation of paragraph 2 flies in the face of the well known rule of contract interpretation "that a court should construe ambiguous language against the interest of the party that drafted it." *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). *See also* Restatement (Second) of Contracts § 206 (1979)("[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds").[10] Because Defendants drafted the Distribution Agreement, any ambiguity therein should be construed against their interests, assuming, *arguendo,* that such ambiguity is (even) present here.

The Distribution Agreement, perhaps not a model of expert draftsmanship, is nonetheless " 'instinct with an obligation

...'", *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 91, 118 N.E. 214 (1917) (citation omitted)(Cardozo, J.), and the intent of the parties is clear. Defendants' cannot avoid their obligation(s) under the contract by postulating an unreasonable (commercially unsound) interpretation of the contract terms and seeking to muddy the waters further with parol evidence. *See Readco v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir.1996)(stating that parol evidence is not admissible even to prove ambiguity).

### Conclusion

For the foregoing reasons, Plaintiff's motion *in limine* [36–1] is granted.[11] The parties are directed (forthwith) to contact Court Deputy Christine Murray at (212) 805–6715 to schedule a settlement/status conference.

---

9. *See* U.C.C. § 1–203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement").

10. "Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what mean-

ing to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party." Restatement (Second) of Contracts § 206 cmt. a (1979).

11. This Order in no way restricts the parties from seeking to admit other evidence as appropriate under the rules of evidence and the U.C.C.