In Re Shelburne Supermarket, No. S0065-03 Cncv (Katz, J., Sept. 11, 2003)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                    SUPERIOR COURT
Chittenden County, ss.:                                    Docket No. CnCv


SHELBURNE SUPERMARKET


FINDINGS OF FACT
CONCLUSIONS OF LAW
NOTICE OF DECISION


This matter was tried to the court on Harry and Lucille Clayton's petition to modify or vacate the award of Arbitrator Arthur O'Dea. On the basis of evidence at trial, the following decision is announced.

FINDINGS OF FACT

1.      Harry Clayton started the Shelburne Supermarket, along with a partner, then bought out the partner, eventually incorporating.  Share of stock in the business were then given to his five children.  One of those children, Steven, assumed the role of store manager, and was thereby given more than the others.  Some time in the 1980s, however, there was some sort of agreement which would have resulted in Steven obtaining his parents' substantial shares.

2.      Putting aside the merits of Steven's claims, which are not here pertinent, a nagging disagreement arose between he and Harry regarding that decision to convey the parents' shares.  It persisted throughout the 1990s, with the result that there were few if any normal corporate meetings, because it was unclear who owned which shares, and therefore who had how many votes.  The difficulties in corporate governance and management led to the other shareholders securing the services of business lawyer Jon Eggleston.

3.      Eggleston met with all the pertinent parties in the early Fall, 2001.  He discussed the problems of the ongoing standoff, and urged Harry and Steven to engage in alternative dispute resolution, to achieve a quick, inexpensive and less painful conclusion to their disagreement.  They were both interested.  Eggleston probably discussed mediation and arbitration, but no one at that shareholder meeting was all that informed as to the differences between these alternatives.  No actual agreement was reached, although there was a resolve to pursue the issue.  Harry and Steven hired respective attorneys, Harry Stephen Unsworth, Steven Leighton Detora.  The three lawyers them inched their way forward, Eggleston eventually arranging a day with Arthur O'Dea.

4.      By the time the contending parties arrived with their lawyers at O'Dea's place of business, there was a general understanding that they would arbitrate their dispute, although we are persuaded Harry Clayton may not have understood the difference. O'Dea handed out a form arbitration agreement, and told the parties that they had to sign it. They did. That agreement provided that they agreed to arbitrate their "dispute," and that O'Dea would be the arbitrator. But it did not delineate in any way what that dispute was. Their was no space on the form to state the nature of the dispute, either what was included or what was not. The parties did not add anything to that form. After the form was signed, the proceedings commenced.

5.      Attorney Unsworth stood up on behalf of Harry and Lucille Clayton and commenced his opening statement, including in it that his clients felt they had an issue regarding a statute of limitation. By this, he alluded to a defense he believed they had, such that the passage of time barred Steven from enforcing any agreement of his parents or his dad to convey their stock to him.

6.      In response, Attorney Detora, on behalf of Steven, objected. Detora uttered some legalistic argument, to the effect that statute of limitation had never been part of any discussion, and that it was improper to introduce it into the proceedings after they had commenced, without any warning. Detora's response is best understood as a procedural objection. At some point Detora also said "If that's your attitude, we might as well pack and leave right now." His client was clearly of the view that he wanted the dispute between he and his father, which had hampered corporate governance for more than a decade, finally resolved.

He did not want a proceeding which would fail to resolve the dispute, because some issue continued to be held back, like some sort of trump card.

7.      Hearing Detora's objection, O'Dea turned to Unsworth for a response.  The latter huddled with Harry Clayton to discuss what their position would be.

8.      What Unsworth responded is the subject of a difference in recollection, which appears significant, in the context of this case.  Detora recalls Unsworth stating, after huddling with his client, "We will withdraw the statute of limitations, it will not be part of this proceeding."  Unsworth recalls having said he was either "preserving" or "reserving" the issue.  Detora denies that either verb was used.

We find that Detora's recollection, that Unsworth "withdrew" the issue from the arbitration is the more persuasive one, the more likely to have occurred.  We reach this factual finding for several reasons.  First, we find persuasive Detora's reason that whatever Unsworth said, it resulted in Detora's "sitting down."  Detora is an experienced litigator.  He knew that his client's highest priority was finality; that is why they were in arbitration.  To have continued with arbitration while the opposition was holding some issue back for later use would have totally defeated this purpose.  Detora would have persisted in his objection.  It is clear from both sides that O'Dea never overruled Detora's objection, yet he did sit down and the arbitration resumed and completed.  Also supporting Detora's recollection is his contemporaneous note on the issue, written while the proceedings were ongoing:

ARBITRATOR NOT TO ADDRESS - S/LIMITATIONS

Quite clearly, Detora understood at the time this issue was no longer part of the arbitration. Hence, his procedural objection to introduction of the statute of limitation issue was successful.

It is also clear that Unsworth never articulated for what forum "preservation/reservation" was intended. Was it to be a second proceeding before O'Dea? A separate court suit in the event of loss before O'Dea? It seems wholly unlikely and unpersuasive that two attorneys as experienced as Detora and O'Dea would have let these questions go unanswered, and just blithely proceeded with an arbitration ostensibly intended to finally resolve a dispute reaching back to 1989.

Where did Unsworth's preservation/reservation recollection come from? Although we cannot know for sure, it would appear that this locution may have been prompted by O'Dea's "procedural history" paragraph on page 2 of his decision:

> At the outset the Statute of Limitations was raised by Harry and Lucille. Steven contends it was waived when the parties decided to go to an alternate dispute resolution method. Harry and Lucille contend it was *preserved* as an issue.

O'Dea never answers these opposing contentions. It is unclear why he included them in his discussion. He may have gotten into this question, because post-arbitration correspondence was sent to him on this issue. Attorney Eggleston weighed in on the subject in June 22 letter, four days after the arbitration session. Detora forwarded Eggleston's letter to O'Dea

June 26, with his belief "that the statute of limitations is not a part of the arbitration proceeding." Unsworth, in turn, replied July 1 that his client did not "want to negotiate, mediate or arbitrate further. He believes strongly that he cannot transfer stock to his son, and if any attempt is made to do this, he will assert the statute of limitations." Detora made a surreply to O'Dea July 3, again mentioning statute of limitations. O'Dea on July 10 denied Harry Clayton's request to terminate the arbitration, and advised that he would proceed to make a decision. Hence, when O'Dea wrote his decision, about a week later, the statute of limitation issue was obviously in his mind. He included it, without apparent purpose or conclusion. But he did use the word "preserve," and it appears to have stuck. We find it is more likely the word first arose in this dispute when O'Dea used it, not in some earlier use by Unsworth June 18. Although Harry's post-trial memo emphasizes that he never communicated with O'Dea on this issue, subsequent to June 18, that is not conclusive. O'Dea knew of Harry's contention, that the statute of limitations was somehow still "out there," available to block any forced conveyance, albeit through Detora's forwarding of Eggleston's letter.

We find that the statute of limitation issue was unilaterally taken off the table at the arbitration. We decline to find that it was explicitly or implicitly saved, preserved or reserved on June 18, by some statement of Unsworth, acquiesced in by Detora or his client.

9.     The flurry of correspondence subsequent to the June 18 arbitration is also significant for the absence of any suggestion that the parties had reached some sort of agreement regarding the limitation issue. On July 1, Unsworth's two letters indicate that if Steven attempts to force Harry to convey "he will assert the statute of limitations," "Harry will raise the

statute of limitations."  There is no suggestion of any mutual understanding regarding this issue.  Detora's letter of July 3 recognizes the limitations issue as "remaining," but again there is no hint of any agreement regarding it.  Obviously, when Unsworth has just raised the issue in his letter, the issue remained "out there."  O'Dea's letter of July 10 indicates he will "prepare a final decision."  He certainly did not understand that his decision would be either partial or preliminary, because there was an agreement to keep part of the dispute away from him.  Indeed, even after O'Dea's decision was issued and reviewed, Unsworth still looked back at the June 18 proceeding in terms of whether his client had "waived" the issue of limitations, not that a mutual agreement of preservation had been reached.

10.      An arbitration proceeding then commenced, in the ordinary understanding of that term.  Both sides presented their evidence relating to the background of the Shelburne Supermarket shares of stock, whether there was an agreement by Harry and Lucille to convey them to Steven, whether the latter had done what was required of him to secure that conveyance.

11.      Sometime during the testimony of Steven, which came after that of Harry, a decision was made to switch gears and also attempt mediation.  So O'Dea went off for a stroll with Unsworth and Detora.  Whatever they discussed, no agreement was reached.  At some point during the day, the parties did pack up and leave, although O'Dea told them they should continue to negotiate, and that he would delay issuing a decision to give them such an opportunity.  Hence, by the time they left, O'Dea had clearly manifested his return to the arbitration mode, in which he would decide the dispute.  No party objected to this, that day.

12.     In the previously cited, post-arbitration correspondence, Harry Clayton sought to terminate the arbitration. We can infer his reason for so attempting, because O'Dea in his decision tells us that, while in mediation mode, he gave the attorneys a "weather report." EX. 11, p. 2. Given the fact that he ultimately ruled for Steven, it seems likely that the weather report favored Steven, and it is not surprising that Harry wanted to terminate the proceeding.

13.     O'Dea issued a written decision for Steven on August 19, 2002, including something akin to findings of fact. It was mailed to counsel and received by August 21. Although not mailed by certified mail, there is no question but that both Detora and Unsworth promptly received it. Unsworth wrote a letter to Detora and Eggleston August 21 clearly showing receipt of the decision, in which he continues to assert the statute of limitations defense.

14.     October 2, Eggleston writes a letter as attorney for the corporation, indicating that it will take some actions unfavorable to Harry and Louise, on the basis of the O'Dea decision.

15.     Within 30 days of the O'Dea decision, Harry and Lucille Clayton and their attorney took no steps to seek reconsideration, appeal or nullification of the arbitration award.

## CONCLUSIONS OF LAW

16.     Arbitrator O'Dea's form contract is one for the arbitration of disputes. Although it is unfortunate in that it makes no provision for the parties to set out the nature of the dispute they agree to arbitrate, it is clearly an agreement to arbitrate. It has nothing to do with mediation, that word nowhere appears on the form. EX. F.

17.     The parties agreed to arbitrate their "dispute." EX. F. Absent more explicit definition, the only reasonable reading of the agreement is that "dispute" means the claim of Steven that Harry and Lucille should re-convey the shares of stock rightfully belonging to him, which they had refused to do since 1989, which claim they disputed. That is what the evidence presented before O'Dea covered. It is what the Decision discussed. To the extent "dispute" might have been ambiguous, its meaning can be discerned from the conduct of the parties subsequent to signing their agreement—the presentation of evidence before O'Dea. Isbrandtsen v. North Branch, 150 Vt. 575, 578 (1988); U.S. Fire Ins. Co. v. Nat'l Gypsum Co., 101 F.3d 813, 817 (2d Cir. 1996) (resolving ambiguity about a dispute in favor of arbitration). No one suggests that O'Dea decided the wrong thing.

18.     The agreement to arbitrate their dispute did not, by itself, foreclose introduction of an affirmative defense, such as statute of limitation. In re Robinson/Keir Partnership, 154 Vt. 50, 55–56 (1990) (noting that the authority of an arbitrator from the agreement may be supplemented by submissions). Whether it would have been excluded, procedurally, such as for late notice, was up to the arbitrator. R.E. Bean Const. Co. v. Middlebury Associates, 139 Vt. 200, 209 (1980). We have made findings regarding how the issue was discussed and handled at the arbitration proceeding.

19.     An arbitration agreement inherently includes the concept that the parties agree to be bound by the decision of the arbitrator.  12 V.S.A. § 5676; Springfield Teachers Ass'n v. Springfield School Directors, 167 Vt. 180, 184 (1997); Johnson v. Worden, 47 Vt. 457, 462 (1874).

20.     It is possible the parties could have strayed from their agreement, such as by taking one issue off the table at the arbitration, to be preserved or reserved for some future date or forum.  But in order for such a preservation or reservation to have been effective, it must have constituted legally recognized act—either a novation mutually agreed, or some sort of estoppel or other conduct granting one party partial relief from the essential concept of submission of the dispute to final resolution by the arbitrator.  The arbitration itself is a creature of contract.  In re Robinson, 154 Vt. at 55 (quoting R.E. Bean Const. Co., 139 Vt. at 209).  If there is to be any deviation from the agreement to arbitrate the dispute to final resolution, something must have occurred which would excuse one party from its obligation under the contract.  See, e.g., Lakeside Equip. Corp. v. Town of Chester, 173 Vt. 317, 322–26 (2002) (refusing to enforce an out-of-state arbitration based on significant jurisdictional and agency issues); Diamond Glass Corp. v. Glass Warehouse Workers & Paint Handlers, 682 F.2d 301 (2d Cir. 1982) (refusing a Union appeal to submit a dispute to arbitration due to the agreement's expiration and the Union's failure to link the rights asserted to the agreement).  Taken as a whole, the record does not support a deviation from the arbitration agreement.

21.     Although we have indicated that the idea of preservation/reservation of the limitation issue, by agreement, is not supported as a matter of fact, we also conclude it is an unreasonable inference as a matter of law.  As previously indicated, arbitration is inherently a creature of contract.  In re Robinson, 154 Vt. at 55.  Parties may well agree to arbitrate some part of their dispute, but not other parts.  Mastrobuono v. Shearson, Lehman Hutton, Inc., 514 U.S. 52, 57 (1995) (noting that parties are generally free through contract to limit or modify arbitration issues as they see fit).  For example, labor and management might well agree to arbitrate all issues of shop-floor work assignments,

but might exclude from arbitration all civil rights or unjust termination claims. But an agreement to arbitrate a dispute, yet withhold one issue which could determine the outcome, makes no sense at all. The statute of limitations is not a discrete area of dispute, it is merely an affirmative defense to the single issue which separated these parties—the parents' obligation to reconvey stock.

22.     The decision of the arbitrator is preclusive of the claim submitted to him. See Agway, Inc. v. Gray, 167 Vt. 313, 316 (1997) ("For purposes of both res judicata and collateral estoppel, it is widely accepted that an arbitration is in the nature of a judicial inquiry, and thus has the same force and effect of an adjudication in terms of precluding the same parties from relitigating the same subject.").

23.     When Harry and Lucille Clayton both failed to present evidence regarding a statute of limitation issue and failed to secure an agreement to remove that issue from the scope of the arbitrated "dispute," they lost that issue.

24.     If there was any prejudice to Harry and Lucille regarding the limitation issue, it derived from the unilateral act of their own attorney, not from the act or omission of Detora or O'Dea. Regardless of whether Unsworth purported to preserve or reserve the issue, as he testified, or whether he simply declined or failed to present evidence on it, as Detora recalls the event, Unsworth's was the act or omission of consequence. In either case, Unsworth failed to present the evidence. Under the preservation/reservation rubric, he did so under the mistaken belief that one side may unilaterally carve out an affirmative defense from an arbitration proceeding. Springfield Teachers Ass'n, 167 Vt. at 187–90 ("The usefulness of arbitration is undermined if issues can be withheld from the arbitrator and raised for the first in court long after the arbitration is over."). If it was mere failure to present supporting evidence or legal argument supporting the limitation issue, that failure precludes subsequent challenge. See Joder Building Corp. v. Lewis, 153 Vt. 115, 120–22 (1989).

# NOTICE OF DECISION

For the foregoing reasons, the court expects to enter judgment confirming the arbitrator's award and declining to vacate or modify it.

Dated at Burlington, Vermont, _____, 200__.

_____
Judge