STUART, Chief Justice.
Warrior Met Coal, LLC ("Warrior Coal"), sued Eickhoff Corporation in the Tuscaloosa Circuit Court asserting that certain pieces of heavy mining equipment Eickhoff had manufactured and sold to Warrior Coal were defective. Eickhoff subsequently moved the trial court to compel Warrior Coal to arbitrate its claims pursuant to an arbitration provision in contracts executed after the sale of the equipment, not the original purchase-order contracts associated with the allegedly defective equipment. The trial court denied the motion to compel arbitration and Eickhoff appeals. We reverse and remand.
I.
In January 2014, Warrior Coal's predecessor in interest, Jim Walter Resources, Inc. ("JWR"), contracted to purchase two Eickhoff SL 750 longwall shearers-heavy equipment used in underground coal mining to separate slabs of coal from the coal seam or "longwall panel"-direct from Eickhoff at a price of $3.2 million each. The terms and conditions of the purchase-order contract provided JWR with certain warranty protection; the contract contained no arbitration provision, providing only that "venue for any legal proceeding will be in Birmingham, Alabama."
In November 2014, before either of the two ordered longwall shearers were delivered, JWR and Eickhoff executed another contract, referred to as "the SL750 shearer rebuild and life cycle service agreement," or, more simply, "the master service agreement,"[1] which provided that, after the mining of a longwall panel was finished, JWR would deliver the used longwall shearer back to Eickhoff, and Eickhoff would rebuild it at an approximate cost to JWR of $880,000. Pursuant to the master service agreement, Eickhoff also agreed to provide JWR with an Eickhoff employee who would serve as a "life cycle manager" and work on-site at the JWR mines at least 40 hours a week and assist with the longwall shearers and otherwise generally "support longwall operations" by providing training on maintenance and repairs and responding to all requests "for advice, instruction and troubleshooting." The master service agreement further provided that it constituted
"the entire agreement between the parties in respect of its subject matter and supersedes all prior agreements, quotation requests, understandings, representations, warranties, promises, *218 statements, negotiations, letters and documents in respect of its subject matter (if any) made or given prior to the commencement of the term."
Finally, the master service agreement contained an arbitration provision requiring the parties to submit "any dispute, controversy or claim arising out of or in connection with the agreement" to the American Arbitration Association ("the AAA") for binding arbitration conducted in accordance with the AAA's commercial arbitration rules if the parties were not otherwise able to resolve the dispute using all reasonable efforts.
The first of the longwall shearers ordered by JWR was put into service in May 2015. At approximately the same time, JWR and Eickhoff executed yet another contract, the consignment-parts agreement, pursuant to which Eickhoff agreed to provide a supply of spare parts for the longwall shearers, which JWR would store on-site and then pay for on a weekly basis as the parts were needed. The consignment-parts agreement did not contain an arbitration provision; rather, like the purchase-order contract, it provided only that venue for any legal proceeding would be in Birmingham. It also provided that it "constitute[d] the entire agreement between the parties, supersedes any previous agreements and may be amended or modified only by a writing signed by each of the parties."
The second longwall shearer was put into service by JWR in October 2015. That same month, JWR agreed to purchase yet a third SL 750 longwall shearer from Eickhoff for $3,295,000. The purchase-order contract for this transaction explicitly incorporated the terms and conditions of the January 2014 purchase-order contract; accordingly, there was no arbitration provision, and Birmingham was designated as the appropriate venue for any legal proceedings. The October 2015 purchase-order contract also had the same integration provision as did the January 2014 purchase-order contract, providing that "the [purchase order] comprises the entire agreement between [Eickhoff] and [JWR] and supersedes all other previous statements, representations, or agreements, whether written or oral."
During this period, JWR's parent company, Walter Energy, Inc., was involved in bankruptcy proceedings, and, in November 2015, Warrior Coal agreed to acquire substantially all of Walter Energy's and JWR's Alabama assets. Warrior Coal also ultimately agreed to assume various JWR contracts, including the November 2014 master service agreement. As a result of market conditions and the bankruptcy proceedings, mine no. 4-the mine where the two longwall shearers ordered from Eickhoff in January 2014 had been put into operation-was shut down from approximately January 2016 to August 2016. During this shutdown, the longwall shearers were idle.
In March 2016, Warrior Coal completed its purchase of Walter Energy's and JWR's assets. In May 2016, Eickhoff delivered the third longwall shearer to Warrior Coal, and, in June 2016, Warrior Coal's subsidiary executed another master service agreement with Eickhoff for this piece of equipment. This master service agreement was substantially similar to the November 2014 master service agreement and contained an identical arbitration provision. This third longwall shearer was placed into operation in Warrior Coal's mine no. 7 in October 2016.
On February 17, 2017, Warrior Coal notified Eickhoff that it was revoking its acceptance of all three longwall shearers, asserting that it had experienced continual problems with the equipment and that Eickhoff had been unable to satisfactorily *219 remedy those problems. On March 9, 2017, Eickhoff formally notified Warrior Coal that it disputed the claim that the three longwall shearers were defective, set forth the remaining sums owed by Warrior Coal in connection with the purchase of the longwall shearers, and requested a meeting with Warrior Coal's designated dispute representative so that they could attempt to resolve the dispute. This final request was presumably made in accordance with the arbitration provision in the master service agreements, which required that such a step be taken before arbitration could be initiated.
On March 24, 2017, Warrior Coal sued Eickhoff, asserting breach-of-warranty, breach-of-contract, and products-liability claims. Warrior Coal specifically alleged that both the first and third longwall shearers delivered by Eickhoff had failed multiple times, that Eickhoff had been unable to repair them, that the failure of the two longwall shearers had impaired Warrior Coal's ability to produce and sell coal, leaving Warrior Coal no option but to remove the Eickhoff longwall shearers from its mines and to purchase replacement equipment from other sources. In total, Warrior Coal claimed damages in excess of $10 million. On April 2, 2017, Eickhoff filed a demand for arbitration with the AAA pursuant to the arbitration provision in the master service agreements, arguing that the longwall shearers delivered to Warrior Coal had performed in an exemplary fashion and that any problems Warrior Coal now claimed to have experienced with them were the result of insufficient maintenance, exacerbated by the time the machines were idle, as well as unique geological conditions at the Warrior Coal mines. Eickhoff also claimed that its own damages were in excess of $1,032,328. On May 2, 2017, Eickhoff followed up its demand for arbitration by moving the trial court to stay all proceedings related to the lawsuit filed by Warrior Coal and to compel arbitration pursuant to the arbitration provision in the master service agreements.
Warrior Coal thereafter opposed Eickhoff's motion to compel arbitration, arguing that the claims it had asserted against Eickhoff were based on the purchase of the three longwall shearers and were subject to the terms and conditions of the purchase-order contracts, which did not contain an arbitration provision and, in fact, provided that venue for any "legal proceedings" should be in Birmingham.[2] Both parties thereafter filed additional materials concerning the question of whether their dispute fell within the scope of the arbitration provision in the master service agreements, with Eickhoff additionally arguing that, regardless of the ultimate answer, that question should be decided by the arbitrator, inasmuch as the identified arbitration provision dictated that the AAA's commercial arbitration rules would govern arbitration proceedings and those rules provide that the arbitrator is empowered to decide the threshold issue of arbitrability. See Federal Ins. Co. v. Reedstrom, 197 So.3d 971, 976 (Ala. 2015) ("[T]he arbitration provision in this case provides that any arbitration proceedings will be conducted 'pursuant to the then-prevailing commercial arbitration rules of the [AAA].' The relevant commercial arbitration rule, Rule 7(a), expressly provides, in its current form, that '[t]he arbitrator shall have the power to rule on his or her own jurisdiction, *220 including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.' "). On September 1, 2007, the trial court denied Eickhoff's motion to compel arbitration without stating its rationale. Pursuant to Rule 4(d), Ala. R. App. P., Eickhoff appeals that order.
II.
Our standard of review of the denial of a motion to compel arbitration is well settled:
" 'This Court reviews de novo the denial of a motion to compel arbitration. Parkway Dodge, Inc. v. Yarbrough, 779 So.2d 1205 (Ala. 2000). A motion to compel arbitration is analogous to a motion for a summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala. 1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction affecting interstate commerce. Id."[A]fter a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question." Jim Burke Automotive, Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995) (opinion on application for rehearing).' "
Elizabeth Homes, L.L.C. v. Gantt, 882 So.2d 313, 315 (Ala. 2003) (quoting Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala. 2000) ).
III.
It is undisputed that in this case a contract calling for arbitration exists; both master service agreements contain an arbitration provision requiring the parties to arbitrate "any dispute, controversy, or claim arising out of or in connection with [those contracts]." Moreover, there is no dispute but that the master service agreements evidence transactions affecting interstate commerce inasmuch as they are between a Pennsylvania corporation and Alabama companies. Accordingly, the burden of proof is upon Warrior Coal to establish either that the arbitration provision in the master service agreements is invalid or that it does not apply to the instant dispute. On appeal, Warrior Coal pursues this second avenue, arguing that the master service agreements, and the arbitration provision therein, are irrelevant to its instant dispute with Eickhoff inasmuch as the gravamen of this dispute is whether Eickhoff actually delivered the ordered products-functional longwall shearers-and that issue, Warrior Coal argues, is governed by the purchase-order contracts, which contain no arbitration provision, not the master service agreements, which are primarily concerned with rebuilding the longwall shearers after the initial mining of a longwall panel is completed and which, by their own language, limit the operation of the arbitration provision to disputes "arising out of or in connection with [the master service agreements]."
Eickhoff disputes Warrior Coal's characterization of the master service agreements and argues that the instant dispute falls squarely within the reach of the arbitration provision in those contracts. Eickhoff also argues, however, that, to the extent the trial court even considered Warrior Coal's argument, it erred because the issue of arbitrability should have been decided by the arbitrator, not the trial court. We first address who is to decide the issue of arbitrability.[3]
*221 The arbitration provision in the master service agreements provides that "any dispute, controversy or claim arising out of or in connection with the [master service] agreement" that cannot otherwise be resolved by the parties must be submitted to the AAA for binding arbitration conducted in accordance with the AAA commercial arbitration rules. Those rules vest the arbitrator with the power " 'to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.' " Reedstrom, 197 So.3d at 976 (quoting AAA Commercial Arbitration Rule 7(a) ). In CitiFinancial Corp., L.L.C. v. Peoples, 973 So.2d 332 (Ala. 2007), this Court first considered the effect of an arbitration provision specifically incorporating the AAA commercial arbitration rules in a dispute regarding which party-a trial court or an arbitrator-should decide arbitrability issues:
"In Smith v. Mark Dodge, Inc., 934 So.2d 375, 379 (Ala. 2006), we stated:
" 'A threshold issue is which forum should decide the question of the scope of the arbitration agreement. In First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), the United States Supreme Court stated:
" ' "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, see, e.g., Mastrobuono v. Shearson Lehman Hutton, Inc., [514 U.S. 52, 57 (1995) ]; Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985), so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter."
" ' 514 U.S. at 943, 115 S.Ct. 1920. However, the Court warned, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." 514 U.S. at 944, 115 S.Ct. 1920 (quoting AT & T Techs. v. Communications Workers, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ). This Court has similarly required that trial courts order arbitration of the issue of arbitrability when the plain language of the agreement unquestionably shows that the parties agreed to arbitrate the issue of arbitrability. Polaris Sales, Inc. v. Heritage Imports, Inc., 879 So.2d 1129, 1133-34 (Ala. 2003) ; and Ex parte Perry, 744 So.2d 859, 866-67 (Ala.1999).'
"The question presented by this case is whether the arbitration provision clearly and unmistakably provides that *222 the arbitrator shall decide arbitrability. The lenders argue that incorporation into the arbitration provision of the Commercial Rules of the American Arbitration Association, conferring authority to decide such issues on the arbitrator, evidences such an intent. This Court has not decided whether the incorporation of such rules is sufficient to show the parties' intent to delegate the issue of arbitrability to an arbitrator, but federal courts have so held. In Terminix International Co. v. Palmer Ranch Ltd. Partnership, 432 F.3d 1327, 1332 (11th Cir. 2005), the United States Court of Appeals for the Eleventh Circuit stated:
" '[T]he parties have agreed that the arbitrator will [decide the issue of arbitrability] by providing (in all three of the arbitration clauses at issue) that "arbitration shall be conducted in accordance with the Commercial Arbitration Rules then in force of the American Arbitration Association" (AAA). [The relevant AAA rule], in turn, provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." ... By incorporating the AAA Rules ... into their agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid. See, e.g., Contec Corp. v. Remote Solution, Co., 398 F.3d 205, 208 (2d Cir. 2005) ("when ... parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator"); Apollo Computer, Inc. v. Berg, 886 F.2d 469, 473 (1st Cir. 1989) ("By contracting to have all disputes resolved according to the Rules of the ICC ..., Apollo agreed to be bound by Articles 8.3 and 8.4. These provisions clearly and unmistakably allow the arbitrator to determine her own jurisdiction when, as here, there exists a prima facie agreement to arbitrate whose continued existence and validity is being questioned.")....'
"We find the reasoning of the Eleventh Circuit and other Circuit Courts of Appeal that have addressed this issue persuasive and hold that an arbitration provision that incorporates rules that provide for the arbitrator to decide issues of arbitrability clearly and unmistakably evidences the parties' intent to arbitrate the scope of the arbitration provision."
973 So.2d at 339-40 (footnotes omitted). This Court has since consistently reiterated the holding that questions of arbitrability must be decided by an arbitrator when the parties have executed a contract containing an arbitration provision incorporating the AAA commercial arbitration rules. See, e.g., Slamen v. Slamen, 254 So. 3d 188 (Ala. 2017) ; Locklear Auto. Grp., Inc. v. Hubbard, 252 So. 3d 67 (Ala. 2017) ; Managed Health Care Admin., Inc. v. Blue Cross & Blue Shield of Alabama, 249 So. 3d 486 (Ala. 2017) ; Bugs "R" Us, LLC v. McCants, 223 So.3d 913 (Ala. 2016) ; Reedstrom; Anderton v. Practice-Monroeville, P.C., 164 So.3d 1094, 1102 (Ala. 2014) ; and Auto Owners Ins., Inc. v. Blackmon Ins. Agency, Inc., 99 So.3d 1193 (Ala. 2012). Warrior Coal states in its brief to this Court that it "does not in any way challenge that precedent," Warrior Coal's brief, p. 38, but instead argues that the instant case is distinguishable because of the multiple contracts defining the relationship of the parties and the specific language used in those contracts. We disagree.
*223 Regardless of any facts that might be unique to this case, at its simplest, this appeal still essentially amounts to one party asking us to examine multiple contracts between it and another party to hold that certain claims asserted by one of the parties arise under one of those contracts that does not contain an arbitration provision, as opposed to another one of those contracts that does contain an arbitration provision. In Blackmon, it was an insurance agent asking this Court to hold that an insurance company's claims were premised upon a 2005 document that did not contain an arbitration provision as opposed to a 1995 agreement that contained an arbitration provision that, much like the provision in the instant case, was limited to disputes "arising out of" the contract containing it. 99 So.3d at 1194. This Court declined to reach that issue, however, explaining that it was for an arbitrator to decide:
"We do not decide whether the 2005 document is encompassed by the arbitration provision in the 1995 agreement, however, because the AAA Commercial Arbitration Rules, which the parties in the 1995 agreement agreed to be bound by, require the arbitrator to decide that question, and 'doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.' Moses H. Cone Mem'l Hosp. [v. Mercury Constr. Corp.], 460 U.S. [1,] 24-25 [ (1983) ]. We merely note that the various documents at issue in this case underscore that it cannot be said with 'positive assurance,' Ex parte Colquitt, 808 So.2d [1018,] 1024 [ (Ala. 2001) ], that the arbitration provision in the 1995 agreement is not susceptible of an interpretation that would include disputes arising from the 2005 document, nor can it be said at this juncture that the dispute does not arise from the relationship described in the arbitration provision of the 1995 agreement."
99 So.3d at 1198.
Similarly, in Bugs "R" Us, the plaintiff urged this Court to hold that her negligence claim against a pest-control company arose from an apparently erroneous inspection report upon which the plaintiff relied when deciding to purchase real property-which did not contain an arbitration provision-as opposed to a termite-service agreement entered into with the same pest-control company at the time she closed upon the property approximately seven weeks later. 223 So.3d at 914-15. We declined to address that issue, however, noting instead that "[w]hatever merits [the plaintiff's] arguments may or may not have, under the arbitration provision in the termite contract it is not this Court's responsibility to make determinations on those issues." 223 So.3d at 918. Rather, the Court held, it was the responsibility of the arbitrator to make that decision.
Finally, Managed Health Care"involve[d] several contracts between various parties." 249 So. 3d at 487. The plaintiffs, a parent company and its subsidiary, had a long contractual relationship with the defendant insurance company, as evidenced by contracts executed in 1986, 1991, 1995, and 2006; however, in 2015, the plaintiffs sued the defendant asserting multiple contract and fraud claims. However, notwithstanding the fact that they initiated the lawsuit, they eventually moved the trial court to compel the arbitration of their claims, as well as counterclaims filed by the defendant, based upon an arbitration provision in a 2006 contract one of the plaintiffs had executed with the defendant, as well as an arbitration provision in a 2013 contract that the same plaintiff had executed with a third-party contractor alleged *224 to represent the defendant.[4] 249 So. 3d at 489. The defendant opposed the motion to compel arbitration, arguing that the 2006 contract had been terminated and, to the extent the plaintiffs' claims were based upon the 2013 contract, it was not a party to that contract and was not bound by any arbitration provision contained in it. 249 So. 3d at 489. The trial court ultimately agreed with the defendant and denied the motion to compel arbitration, after which the plaintiffs appealed, arguing that the trial court had erred by holding both that the 2006 contract had been terminated and that the plaintiffs' claims did not arise out of or relate to the 2006 contract. 249 So. 3d at 491. This Court subsequently reversed the judgment of the trial court, holding that "whether the arbitration provision in the 2006 contract ha[d] been terminated ... [was an] issue[ ] for the arbitrator, not the circuit court," and that "it [was] for the arbitrator, not the courts, to determine whether the claims asserted by the parties [were] within the scope of the 2006 contract." 249 So. 3d at 493.
Thus, over the course of these cases, this Court has made it clear that, once it is established (1) that two parties to a dispute are bound by a valid contract containing an arbitration provision, (2) that that same contract contains a clear indication that the parties have agreed to arbitrate the issue of arbitrability, and (3) that the subject dispute is at least arguably within the scope of that contract, this Court will not entertain arguments that the dispute actually falls within the scope of some other contract binding the parties that does not contain an arbitration provision. Rather, those arguments should be directed to the arbitrator. See, e.g., Blackmon, 99 So.3d at 1198 ("Because that is an arguable question, it is the arbitrator's task to decide whether the dispute in this case is, or is not, subject to mandatory arbitration under the 1995 agreement."). Numerous parties on appeal-as well as even dissenting Justices on this Court-have urged this Court to abandon this standard and, instead, to make the arbitrability determination in such cases itself; however, we have continually declined to do so. See, e.g., Anderton, 164 So.3d at 1105 (Murdock, J., dissenting) ("It is the court that of necessity must answer the threshold question of whether the dispute falls within the universe of cases as to which the arbitrator is to decide the question of arbitrability because, until the court does so, and does so in the affirmative, it has no basis to send the case to the arbitrator for any purpose."). For this Court to change its analysis of these types of cases now would require us to overrule the line of authority discussed supra, and, as noted, not only has Warrior Coal not asked us to do so, but it has affirmatively stated that it does not in any way challenge that precedent. As we have previously explained, "[e]ven if we would be amenable to such a request [to overrule existing caselaw], we are not inclined to abandon precedent without a specific invitation to do so. 'Stare decisis commands, at a minimum, a degree of respect from this Court that makes it disinclined to overrule controlling precedent when it is not invited to do so.' Moore [v. Prudential Residential Servs. ], 849 So.2d [914,] 926 [ (Ala. 2002) ]." Clay Kilgore Constr., Inc. v. Buchalter/Grant, L.L.C., 949 So.2d 893, 898 (Ala. 2006).
*225 Warrior Coal has not distinguished its case from Managed Health Care, Blackmon, and the other cases cited herein, and the trial court accordingly erred by not granting Eickhoff's motion to compel arbitration.
IV.
Warrior Coal sued Eickhoff alleging that the longwall shearers Eickhoff manufactured and sold it were defective. Eickhoff thereafter moved the trial court to compel Warrior Coal to arbitrate its claims pursuant to an arbitration provision in the master service agreements-contracts between the parties outlining Eickhoff's obligation to rebuild the longwall shearers after their initial term of use and providing for an Eickhoff employee to be on-site with the longwall shearers to provide support for their operation. The breach-of-warranty, breach-of-contract, and products-liability claims asserted by Warrior Coal in its action against Eickhoff are at least arguably connected to the master service agreements inasmuch as those contracts addressed Eickhoff's obligation to provide an employee to assist with the maintenance and operation of the longwall shearers. Accordingly, because the parties also agreed in the master service agreements that the AAA commercial arbitration rules would govern any arbitration, and because those rules empower the arbitrator to decide questions of arbitrability, the trial court erred when it instead at least implicitly resolved the arbitrability issue in favor of Warrior Coal in its order denying Eickhoff's motion to compel. That order is accordingly reversed and the cause remanded for the trial court to enter an order granting Eickhoff's motion to compel arbitration and staying proceedings in the trial court during the pendency of the arbitration proceedings.
REVERSED AND REMANDED.
Bolin, Shaw, Main, Wise, and Sellers, JJ., concur.
Bryan and Mendheim, JJ., concur in the result.
Parker, J., dissents.

Throughout this litigation, Warrior Coal has objected to calling this contract "the master service agreement," instead referring to it by its full title, "the SL750 shearer rebuild and life cycle service agreement," or as simply the "rebuild agreement." However, we note that the contract by its own terms refers to itself as the "master service agreement" or, more simply, as "the agreement." For convenience and to differentiate it from the various other contracts and agreements executed by the parties in this case, we likewise refer to it as "the master service agreement."

Eickhoff notes for this Court that Warrior Coal's action was filed in the Tuscaloosa Circuit Court as opposed to the Jefferson Circuit Court, which operates in Birmingham. We further note that Eickhoff, although arguing that the term "legal proceeding" includes arbitration proceedings, requested in its demand for arbitration that the arbitration hearing be held in Atlanta.

Warrior Coal argues to this Court that Eickhoff waived its argument that the arbitrator must decide the arbitrability issue in this case because Eickhoff did not make that argument in its initial motion to compel arbitration. Eickhoff argues, however, that a party moving to compel arbitration cannot anticipate that the opposing party will seek to avoid an arbitration agreement, much less respond to every potential argument the party might make in that regard. We agree; Eickhoff promptly responded to Warrior Coal's objection, and the arbitrability issue was thoroughly briefed and argued by both sides before the trial court entered its ruling. See Locklear Auto. Grp., Inc. v. Hubbard, 252 So. 3d 67, 96 (Ala. 2017) (holding that the appellants "clearly and explicitly argued to the trial court [at the hearing on the motion to compel arbitration] that there was an arbitrability clause in the arbitration agreement and that the import of the clause was that the issue whether [the appellee's] claims were covered by the arbitration agreement was for the arbitrator to decide, not the trial court. Therefore, the effect of the arbitrability clause is properly before us in this appeal.").

Much like the arbitration provision in the instant case limited itself to any dispute "arising out of or in connection with the [master service] agreement[s]," both of the arbitration provisions identified in Managed Health Care were limited to disputes arising out of or relating to the contracts in which the arbitration provisions were found. 249 So. 3d at 487-88.